Filed 10/17/13

# IN THE SUPREME COURT OF CALIFORNIA

SONIC-CALABASAS A, INC., )
)
    Plaintiff and Appellant, )
)     S174475
    v. )
)     Ct.App. 2/4 B204902
FRANK MORENO, )
)     Los Angeles County
    Defendant and Respondent. )     Super. Ct. No. BS107161
_____)

In *Sonic-Calabasas A, Inc. v. Moreno* (2011) 51 Cal.4th 659 (*Sonic I*), we held as a categorical rule that it is contrary to public policy and unconscionable for an employer to require an employee, as a condition of employment, to waive the right to a Berman hearing, a dispute resolution forum established by the Legislature to assist employees in recovering wages owed. We further held that our rule prohibiting waiver of a Berman hearing does not discriminate against arbitration agreements and is therefore not preempted by the Federal Arbitration Act (FAA). We did not invalidate the arbitration agreement at issue. Instead, we held that if one of the parties is dissatisfied with the result of the Berman hearing, it can move to arbitrate the wage dispute consistent with the arbitration agreement, just as a dissatisfied party can obtain a trial in court without such an agreement.

The United States Supreme Court granted certiorari in this case, vacated the judgment, and remanded the case to this court for consideration in light of *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. __ [131 S.Ct. 1740] (*Concepcion*).

In *Concepcion*, the high court clarified the limitations that the FAA imposes on a state's capacity to enforce its rules of unconscionability on parties to arbitration agreements. In light of *Concepcion*, we conclude that because compelling the parties to undergo a Berman hearing would impose significant delays in the commencement of arbitration, the approach we took in *Sonic I* is inconsistent with the FAA. Accordingly, we now hold, contrary to *Sonic I*, that the FAA preempts our state-law rule categorically prohibiting waiver of a Berman hearing in a predispute arbitration agreement imposed on an employee as a condition of employment.

At the same time, we conclude that state courts may continue to enforce unconscionability rules that do not "interfere[] with fundamental attributes of arbitration." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1748].) Although a court may not refuse to enforce an arbitration agreement imposed on an employee as a condition of employment simply because it requires the employee to bypass a Berman hearing, such an agreement may be unconscionable if it is otherwise unreasonably one-sided in favor of the employer. As we explained in *Sonic I* and reiterate below, the Berman statutes confer important benefits on wage claimants by lowering the costs of pursuing their claims and by ensuring that they are able to enforce judgments in their favor. There is no reason why an arbitral forum cannot provide these benefits, and an employee's surrender of such benefits does not necessarily make the agreement unconscionable. The fundamental fairness of the bargain, as with all contracts, will depend on what benefits the employee received under the agreement's substantive terms and the totality of circumstances surrounding the formation of the agreement.

The employee in this case contends that the particular arbitration scheme at issue is unconscionable, while the employer contends that its arbitration agreement offers adequate protections and advantages to facilitate the employee's claim and

2

is not unreasonably one-sided.  Because evidence relevant to the unconscionability claim was not developed below, we remand to the trial court to determine whether the present arbitration agreement is unconscionable under the principles set forth in this opinion.

### I.

Frank Moreno is a former employee of Sonic-Calabasas A, Inc. (Sonic), which owns and operates an automobile dealership.  As a condition of his employment with Sonic, Moreno signed a document entitled "Applicant's Statement & Agreement."  The agreement set forth a number of conditions of employment, including consent to drug testing and permission to contact former employers, as well as a provision making the employment at will.  The agreement also contained a paragraph governing dispute resolution, which required both parties to submit employment disputes to "binding arbitration under the Federal Arbitration Act, in conformity with the procedures of the California Arbitration Act (Cal. Code Civ. Proc. sec. 1280 et seq. . . .)."  The arbitration provision applied to "all disputes that may arise out of the employment context . . . that either [party] may have against the other which would otherwise require or allow resort to any court or other governmental dispute resolution forum[,] . . . whether based on tort, contract, statutory, or equitable law, or otherwise."  The provision specified that it did not apply to claims brought under the National Labor Relations Act or the California Workers' Compensation Act, or to claims before the Employment Development Department.  The provision further stated that the employee was not prevented from "filing and pursuing administrative proceedings only before the California Department of Fair Employment and Housing or the U.S. Equal Opportunity Commission."

In addition, the agreement provided that arbitration is to be conducted by a "retired California Superior Court Judge" and that "to the extent applicable in civil

3

actions in California courts, the following shall apply and be observed: all rules of pleading (including the right of demurrer), all rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, and judgment under Code of Civil Procedure section 631.8." At the request of either party, an arbitration award may be reviewed by a second arbitrator who will, "as far as practicable, proceed according to the law and procedures applicable to appellate review by the California Court of Appeal of a civil judgment following court trial."

In December 2006, after leaving his position with Sonic, Moreno filed an administrative wage claim with the Labor Commissioner for unpaid vacation pay pursuant to Labor Code section 98 et seq. (All statutory references are to the Labor Code unless otherwise indicated.) Moreno alleged he was entitled to unpaid "[v]acation wages for 63 days earned 7/15/02 to 7/15/06 at the rate of $441.29 per day." The filing of such a claim is the first step toward obtaining a Berman hearing.

In February 2007, Sonic petitioned the superior court to compel arbitration of the wage claim and to dismiss the pending administrative action, arguing that Moreno waived his right to a Berman hearing in the arbitration agreement. The Labor Commissioner intervened on Moreno's behalf (§ 98.5), and Moreno adopted the Labor Commissioner's arguments. The Labor Commissioner argued that the arbitration agreement, properly construed, did not preclude Moreno from filing an administrative wage claim under section 98 et seq. According to the Labor Commissioner, resort to a Berman hearing was compatible with the arbitration agreement because the hearing could be followed by arbitration in lieu of a de novo appeal in the superior court under section 98.2, subdivision (a). The Labor Commissioner further argued that interpreting the arbitration agreement to

4

waive a Berman hearing would violate public policy, relying on *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83 (*Armendariz*).

The superior court denied the petition to compel arbitration as premature. Citing *Armendariz*, the court said that as a matter of "basic public policy . . . until there has been the preliminary non-binding hearing and decision by the Labor Commissioner, the arbitration provisions of the employment contract are unenforceable, and any petition to compel arbitration is premature and must be denied."

Sonic appealed. The Labor Commissioner did not participate in the appeal. During the briefing period in the Court of Appeal, the United States Supreme Court decided *Preston v. Ferrer* (2008) 552 U.S. 346 (*Preston*), which held that the Labor Commissioner's original and exclusive jurisdiction under the Talent Agencies Act (§ 1700 et seq.) was preempted when the parties entered into an arbitration agreement governed by the FAA. The Court of Appeal concluded that *Preston* was not dispositive of Sonic's appeal. According to the court, *Preston* applies when a party challenges the validity of a contract as a whole and seeks to have that challenge adjudicated by an administrative agency; it does not apply when a party challenges the arbitration clause itself as unconscionable. The Court of Appeal further concluded that the arbitration agreement, correctly interpreted, constituted a waiver of a Berman hearing. By its terms, the agreement precluded Moreno from pursuing any judicial "or other government dispute resolution forum," subject to certain enumerated exceptions. The court stated: "Given that neither the Division of Labor Standards Enforcement nor the Labor Commissioner was listed among the stated exceptions, we conclude, as a matter of law, that Moreno was barred from pursuing an administrative wage claim under section 98 et seq." The Court of Appeal then held that a Berman waiver is enforceable and not contrary to public policy.

5

We granted Moreno's petition for review. As discussed below, we held in *Sonic I* that although Moreno could be compelled to arbitrate, he could not be required to waive his right to a Berman hearing before arbitration. Accordingly, we reversed the Court of Appeal and ordered reinstatement of the trial court's denial of Sonic's petition to compel arbitration. Sonic then petitioned the United States Supreme Court for a writ of certiorari. The high court granted the petition, vacated our judgment, and remanded the case to this court "for further consideration in light of *AT&T Mobility LLC v. Concepcion*, 563 U.S. __ [131 S.Ct. 1740, 179 L.Ed.2d 742] (2011)." (*Sonic-Calabasas A, Inc. v. Moreno* (2011) 565 U.S. __ [132 S.Ct. 496].) We requested supplemental briefing from the parties on how *Concepcion* affects our decision in *Sonic I*.

## II.

We begin by reviewing the Berman statutes and our opinion in *Sonic I*.

## A.

In *Sonic I*, *supra*, 51 Cal.4th 569, we explained how Berman hearings and related statutory protections benefit employees with wage claims against their employers: " 'If an employer fails to pay wages in the amount, time or manner required by contract or by statute, the employee has two principal options. The employee may seek judicial relief by filing an ordinary civil action against the employer for breach of contract and/or for the wages prescribed by statute. (§§ 218, 1194.) Or the employee may seek administrative relief by filing a wage claim with the commissioner pursuant to a special statutory scheme codified in sections 98 to 98.8. The latter option was added by legislation enacted in 1976 (Stats. 1976, ch. 1190, §§ 4–11, pp. 5368–5371) and is commonly known as the "Berman" hearing procedure after the name of its sponsor.' [Citation.]

"Once an employee files a complaint with the Labor Commissioner for nonpayment of wages, section 98, subdivision (a) ' "provides for three

6

alternatives:  the commissioner may either accept the matter and conduct an administrative hearing [citation], prosecute a civil action for the collection of wages and other money payable to employees arising out of an employment relationship [citation], or take no further action on the complaint.  [Citation.]" '  (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1115.)  'If the commissioner decides to accept the matter and conduct an administrative hearing, he or she must hold the hearing within 90 days.'  (*Ibid.*)  Moreover, prior to holding a Berman hearing or pursuing a civil action, the Labor Commissioner's staff may attempt to settle claims either informally or through a conference between the parties.  (Dept. of Industrial Relations, Div. of Labor Stds. Enforcement (DLSE), Policies and Procedures for Wage Claim Processing (2001 rev.) pp. 2–3.)

"A Berman hearing is conducted by a deputy [labor] commissioner, who has the authority to issue subpoenas.  (Cal. Code Regs., tit. 8, §§ 13502, 13506.)  'The Berman hearing procedure is designed to provide a speedy, informal, and affordable method of resolving wage claims.  In brief, in a Berman proceeding the commissioner may hold a hearing on the wage claim; the pleadings are limited to a complaint and an answer; the answer may set forth the evidence that the defendant intends to rely on . . . ; if the defendant fails to appear or answer no default is taken and the commissioner proceeds to decide the claim, but may grant a new hearing on request.  (§ 98.)  The commissioner must decide the claim within 15 days after the hearing.  (§ 98.1.)'  [Citation.]  The hearings are not governed by the technical rules of evidence, and any relevant evidence is admitted 'if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs.'  (Cal. Code Regs., tit. 8, § 13502.)  The hearing officer is authorized to assist the parties in cross-examining witnesses and to explain issues and terms not understood by the parties.  (DLSE, Policies and Procedures for

7

Wage Claim Processing, *supra*, at p. 4.)  The parties have a right to have a translator present.  (*Ibid.*; see § 105 . . . .)

"Once judgment is entered in the Berman hearing, enforcement of the judgment is to be a court priority.  (§ 98.2, subd. (e).)  The Labor Commissioner is charged with the responsibility of enforcing the judgment and 'shall make every reasonable effort to ensure that judgments are satisfied, including taking all appropriate legal action and requiring the employer to deposit a bond as provided in Section 240.'  (*Id.*, subd. (i).)

"Within 10 days after notice of the decision any party may appeal to the appropriate court, where the claim will be heard de novo; if no appeal is taken, the commissioner's decision will be deemed a judgment, final immediately, and enforceable as a judgment in a civil action.  (§ 98.2.)  If an employer appeals the Labor Commissioner's award, '[a]s a condition to filing an appeal pursuant to this section, an employer shall first post an undertaking with the reviewing court in the amount of the order, decision, or award.  The undertaking shall consist of an appeal bond issued by a licensed surety or a cash deposit with the court in the amount of the order, decision, or award.'  (§ 98.2, subd. (b).)  The purpose of this requirement is to discourage employers from filing frivolous appeals and from hiding assets in order to avoid enforcement of the judgment.  (Sen. Com. on Labor and Industrial Relations, Analysis of Assem. Bill No. 2772 (2009–2010 Reg. Sess.) as amended Apr. 8, 2010, p. 4.)

"Under section 98.2, subdivision (c), 'If the party seeking review by filing an appeal to the superior court is unsuccessful in the appeal, the court shall determine the costs and reasonable attorney's fees incurred by the other parties to the appeal, and assess that amount as a cost upon the party filing the appeal.  An employee is successful if the court awards an amount greater than zero.'  This provision thereby establishes a one-way fee-shifting scheme, whereby

8

unsuccessful appellants pay attorney fees while successful appellants may not obtain such fees. [Citation.] This is in contrast to section 218.5, which provides that in civil actions for nonpayment of wages initiated in the superior court, the 'prevailing party' may obtain attorney fees.

"Furthermore, the Labor Commissioner 'may' upon request represent a claimant 'financially unable to afford counsel' in the de novo proceeding and 'shall' represent the claimant if he or she is attempting to uphold the Labor Commissioner's award and is not objecting to the Commissioner's final order. (§ 98.4.) Such claimants represented by the Labor Commissioner may still collect attorney fees pursuant to section 98.2, although such claimants have not, strictly speaking, incurred attorneys fees, because construction of the statute in this manner is consistent with the statute's goals of discouraging unmeritorious appeals of wage claims. [Citation.]" (*Sonic I*, *supra*, 51 Cal.4th at pp. 672–674, fn. omitted.)

In sum, the Berman statutes provide important benefits to employees by reducing the costs and risks of pursuing a wage claim in several ways. First, the Berman hearing itself provides an accessible, informal, and affordable mechanism for lay persons to seek resolution of such claims. (See *Cuadra v. Millan* (1998) 17 Cal.4th 855, 858 (*Cuadra*).) Second, section 98.2, subdivision (c) discourages unmeritorious appeals of Berman hearing awards by providing that a party who unsuccessfully appeals an award must pay the other party's costs and attorney fees. (See *Lolley v. Campbell* (2002) 28 Cal.4th 367, 376 (*Lolley*).) Third, section 98.2, subdivision (c) provides that an employee will not be saddled with the employer's attorney fees and costs unless the employee appeals from a Berman hearing award and receives a judgment of zero on appeal. This rule differs from section 218.5, which provides for attorney fees for the "prevailing party" in wage actions initiated in the superior court. Fourth, section 98.4 provides that a wage

9

claimant who is "financially unable to afford counsel" may be represented by the commissioner in the event the employer appeals and "shall" be represented by the commissioner if the employee seeks to uphold a Berman hearing award. Fifth, the Berman statutes ensure that an employee will actually collect a judgment or award by mandating that the Labor Commissioner use her best efforts to collect a Berman hearing award and by requiring the employer to post an undertaking for the amount of the award if it takes an appeal. (See *Sonic I*, *supra*, 51 Cal.4th at p. 674; § 98.2, subds. (b), (e), (i).) Finally, the Berman process ensures that employees have assistance in resolving their claims, including the use of a translator if needed. (§ 105.)

**B.**

In considering whether a Berman waiver violates public policy, *Sonic I* first reviewed the law governing mandatory employment arbitration agreements, i.e., arbitration agreements that are conditions of new or continuing employment. As we explained, "[i]n *Armendariz, supra*, 24 Cal.4th 83, we concluded that such agreements were enforceable, provided they did not contain features that were contrary to public policy or unconscionable. (*Id.* at p. 99.) We concluded that 'arbitration agreements cannot be made to serve as a vehicle for the waiver of [unwaivable] statutory rights,' such as rights under the Fair Employment and Housing Act (FEHA . . .). To ensure that such waiver did not occur, we held that arbitrations addressing such statutory rights would be subject to certain minimal requirements. As we later summarized these: '(1) the arbitration agreement may not limit the damages normally available under the statute (*Armendariz, supra*, 24 Cal.4th at p. 103); (2) there must be discovery "sufficient to adequately arbitrate their statutory claim" (*id.* at p. 106); (3) there must be a written arbitration decision and judicial review " 'sufficient to ensure the arbitrators comply with the requirements of the statute' " (*ibid.*); and (4) the employer must "pay all types of

10

costs that are unique to arbitration" (*id.* at p. 113).' (*Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1076 (*Little*).)  We did not hold that the above requirements were the only conditions that public policy could place on arbitration agreements, and have since recognized other limitations.  (See *Gentry v. Superior Court* (2007) 42 Cal.4th 443, 463 (*Gentry*) [prohibition of class arbitration contrary to public policy in some cases].)"  (*Sonic I*, *supra*, 51 Cal.4th at p. 677.)

We then concluded that the protections afforded by a Berman hearing may not be waived as a condition of employment:  "There is no question that the lawful payment of wages owed is not merely an individual right but an important public policy goal. . . .  'Civil Code section 3513 provides, in pertinent part, that:  "[a]nyone may waive the advantage of a law intended solely for his benefit.  But a law established for a public reason cannot be contravened by a private agreement."  [¶]  The determination of whether a particular statute is for public or private benefit is for the court in each case (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 645, p. 586).  The provisions of the Labor Code, particularly those directed toward the payment of wages to employees entitled to be paid, were established to protect the workers and hence have a public purpose.  As was pointed out in *In re Trombley* (1948) 31 Cal.2d 801, 809:  "[i]t has long been recognized that wages are not ordinary debts, that they may be preferred over other claims, and that, because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due."  [Citation.]'  [Citation.]"  (*Sonic I*, *supra*, 51 Cal.4th at p. 679.)

We went on to explain:  "Although the statutory protections that the Berman hearing and the posthearing procedures afford employees were added piecemeal over a number of years, their common purpose is evident:  Given the dependence of the average worker on prompt payment of wages, the Legislature

11

has devised the Berman hearing and posthearing process as a means of affording an employee with a meritorious wage claim certain advantages, chiefly designed to reduce the costs and risks of pursuing a wage claim, recognizing that such costs and risks could prevent a theoretical right from becoming a reality. These procedures, including the employer undertaking and the one-way fee provision, also deter employers from unjustifiably prolonging a wage dispute by filing an unmeritorious appeal. This statutory regime therefore furthers the important and long-recognized public purpose of ensuring that workers are paid wages owed. The public benefit of the Berman procedures, therefore, is not merely incidental to the legislation's primary purpose but in fact central to that purpose. Nor can there be any doubt that permitting employers to require employees, as a condition of employment, to waive their right to a Berman hearing would seriously undermine the efficacy of the Berman hearing statutes and hence thwart the public purpose behind the statutes." (*Sonic I*, *supra*, 51 Cal.4th at p. 679.)

We rejected Sonic's argument that "even if a nonarbitration clause that required a Berman hearing waiver is contrary to public policy, an arbitration clause containing the same waiver would not be, because arbitration offers the same or similar advantages as does the Berman hearing process." (*Sonic I*, *supra*, 51 Cal.4th at p. 680.) We explained that "the choice is not between a Berman hearing and arbitration, because a person subject to binding arbitration and eligible for a Berman hearing will still be subject to binding arbitration if the employer appeals the Berman hearing award. The choice is rather between arbitration that is or is not preceded by a Berman hearing. As discussed above, there are considerable advantages for employees to undergo the Berman hearing process before arbitration." (*Ibid.*) "In contrast, arbitration, notwithstanding its advantages as a reasonably expeditious means of resolving disputes, still generally bears the hallmark of a formal legal proceeding in which representation by counsel

12

is necessary or at least highly advantageous.  The arbitration in question here, for example, is to be conducted by a 'retired California Superior Court Judge' and 'to the extent applicable in civil actions in California courts, the following shall apply and be observed:  all rules of pleading (including the right of demurrer), all rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, and judgment under Code of Civil Procedure section 631.8.'  The arbitrator's award at either party's request will be reviewed by a second arbitrator who will 'as far as practicable, proceed according to the law and procedures applicable to appellate review by the California Court of Appeal of a civil judgment following court trial.'  A wage claimant undergoing arbitration will need the same kind of legal representation as if he or she were going to superior court." (*Sonic I*, *supra*, 51 Cal.4th at pp. 680–681.)

We therefore concluded that "an employee going directly to arbitration will lose a number of benefits and advantages.  He or she will not benefit from the Labor Commissioner's settlement efforts and expertise.  He or she must pay for his or her own attorney whether or not he or she is able to afford it — an attorney who may not have the expertise of the Labor Commissioner.  Moreover, what matters to the employee is not a favorable arbitration award per se but the enforcement of that award, and an employee going directly to arbitration will have no special advantage obtaining such enforcement.  Nor is there any guaranty that the employee will not be responsible for any successful employer's attorney fees, for under section 218.5, an employee who proceeds directly against an employer with a wage claim not preceded by a Berman hearing will be liable for such fees if the employer prevails on appeal.  In short, the Berman hearing process, even when followed by binding arbitration, provides on the whole substantially lower costs and risks to the employee, greater deterrence of frivolous employer claims, and

13

greater assurance that awards will be collected, than does the binding arbitration process alone." (*Sonic I*, *supra*, at p. 681, fns. omitted.)

We also rejected Sonic's argument that because employees have the option of pursuing a Berman hearing or going directly to court (§ 218), Berman hearings must be waivable in a predispute agreement. "The purpose of the Berman hearing statutes is to empower wage claimants by giving them access to a Berman hearing with all of its advantages. Allowing an employee the freedom to choose whether to resort to a Berman hearing when a wage claim arises, after evaluating in light of the particular circumstances whether such a hearing is advantageous, is wholly consistent with the public policy behind the Berman hearing statutes. A requirement that the employee surrender the option of a Berman hearing as a condition of employment is not. As we recognized in *Armendariz*, our concern is with the impermissible waiver of certain rights and protections as a condition of employment before a dispute has arisen. (See *Armendariz*, *supra*, 24 Cal.4th at p. 103, fn. 8.) We therefore find the argument that, because the Legislature intended an employee to have the option of a Berman hearing when a wage claim arises, the Legislature also must have intended to permit employers to require employees to waive that option as a condition of employment, to be unpersuasive." (*Sonic I*, *supra*, 51 Cal.4th at pp. 682–683, fn. omitted.) For the reasons above, we held that a Berman waiver in the context of a predispute arbitration agreement violates public policy. (*Id.* at p. 684.)

## C.

*Sonic I* further held that a Berman waiver is unconscionable. As we explained: "One common formulation of unconscionability is that it refers to ' "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." ' [Citation.] As that formulation implicitly recognizes, the doctrine of unconscionability has

14

both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results. 'The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, " 'which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " ' (*Little*, *supra*, 29 Cal.4th at p. 1071.)

" 'Substantively unconscionable terms can take various forms, but may generally be described as unfairly one-sided. One such form, as in *Armendariz*, is the arbitration agreement's lack of a " 'modicum of bilaterality,' " wherein the employee's claims against the employer, but not the employer's claims against the employee, are subject to arbitration. (*Armendariz*, *supra*, 24 Cal.4th at p. 119.) Another kind of substantively unconscionable provision occurs when the party imposing arbitration mandates a post-arbitration proceeding, either judicial or arbitral, wholly or largely to its benefit at the expense of the party on which the arbitration is imposed.' (*Little*, *supra*, 29 Cal.4th at pp. 1071–1072.) In determining unconscionability, our inquiry is into whether a contract provision was 'unconscionable at the time it was made.' (Civ. Code, § 1670.5, subd. (a).)" (*Sonic I*, *supra*, 51 Cal.4th at pp. 684–685.)

Applying these principles, we first observed that "the arbitration agreement was a contract of adhesion indisputably imposed as a condition of employment" and that "contract terms imposed as a condition of employment are particularly prone to procedural unconscionability." (*Sonic I*, *supra*, 51 Cal.4th at pp. 685–686.) " '[I]n the case of preemployment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job

15

because of an arbitration requirement.' (*Armendariz*, *supra*, 24 Cal.4th at p. 115.) Moreover, many employees may not give careful scrutiny to routine personnel documents that employers ask them to sign. (See *Gentry*, *supra*, 42 Cal.4th at p. 471.)

"Furthermore, for reasons suggested above, significant substantive unconscionability is also present. As explained, Berman hearing and posthearing procedures were designed to provide wage claimants with meritorious claims unique protections that lower the costs and risks of pursuing such claims, leveling a playing field that generally favors employers with greater resources and bargaining power. Requiring employees to forgo these protections as a condition of employment can only benefit the employer at the expense of the employee. Nor can we say, as also explained, that the benefits the employee gains from arbitration compensates for what he or she loses by forgoing the option of a Berman hearing.

"In sum, rather than being justified by 'legitimate commercial needs' (see *Armendariz*, *supra*, 24 Cal.4th at p. 117), the main purpose of the Berman waiver appears to be for employers to gain an advantage in the dispute resolution process by eliminating the statutory advantages accorded to employees designed to make that process fairer and more efficient. We conclude the waiver is markedly one-sided and therefore substantively unconscionable. This substantive unconscionability, together with the significant element of procedural unconscionability, leads to the conclusion that the Berman waiver in the arbitration agreement at issue here is unconscionable." (*Sonic I*, *supra*, 51 Cal.4th at p. 686.)

**D.**

Although we found the Berman waiver unconscionable and contrary to public policy, we did not invalidate the arbitration agreement. Instead, we held that an arbitration agreement may be enforced so long as arbitration is preceded by

16

the option of a Berman hearing at the employee's request.  If the employee chooses to have a Berman hearing, then the post-Berman hearing protections for employees would apply in arbitration:  "A party to a Berman hearing seeking a de novo appeal via arbitration pursuant to a prior agreement rather than through a judicial proceeding would initially file an appeal in superior court pursuant to section 98.2, subdivision (a), together with a petition to compel arbitration.  The superior court would determine whether the appeal is timely and whether it comports with all the statutory requirements, such as the undertaking requirement in subdivision (b).  If so, and if the petition to compel arbitration is unopposed, or found to be meritorious, the trial court will grant the petition.  The Labor Commissioner, pursuant to section 98.4, may then represent an eligible wage claimant in the arbitration proceeding.  The one-way fee-shifting provisions of section 98.2, subdivision (c) will be enforced initially by the arbitrator, with such judicial review as may be appropriate."  (*Sonic I*, *supra*, 51 Cal.4th at p. 676.)

Finally, we held that the FAA does not preempt this approach because "our conclusion that Berman waivers are contrary to public policy and unconscionable does not discriminate against arbitration agreements."  (*Sonic I*, *supra*, 51 Cal.4th at p. 689.)  "Rather, our conclusion that a Berman waiver is contrary to public policy and unconscionable is equally applicable whether the waiver appears within an arbitration agreement or independent of arbitration."  (*Ibid.*)  Below we discuss in greater detail *Sonic I*'s analysis of the preemption issue after first examining the high court's decision in *Concepcion*.

### III.

Two months after *Sonic I* was filed, the United States Supreme Court issued its decision in *Concepcion*, *supra*, 563 U.S. __ [131 S.Ct. 1740].  We now analyze the effect of that decision on *Sonic I*, beginning with a review of the state-law rule at issue in *Concepcion*.

17

## A.

In *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148 (*Discover Bank*), this court confronted the question of whether provisions in arbitration agreements waiving class actions are unconscionable. We had previously approved of class arbitration as a means of " 'provid[ing] small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation.' [Citation.] Denial of a class action in cases where it is appropriate may have the effect of allowing an unscrupulous wrongdoer to 'retain[ ] the benefits of its wrongful conduct.' [Citation.]" (*Keating v. Superior Court* (1982) 31 Cal.3d 584, 609 (*Keating*), overruled on other grounds in *Southland Corp. v. Keating* (1984) 465 U.S. 1, 16.) We held in *Discover Bank* that when a class arbitration waiver "is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then . . . the waiver becomes in practice the exemption of the party 'from responsibility for [its] own fraud, or willful injury to the person or property of another.' (Civ. Code, § 1668.) Under these circumstances, such waivers are unconscionable under California law and should not be enforced." (*Discover Bank*, at pp. 162–163.)

We further held that the FAA does not preempt this unconscionability rule. Reciting the applicable law, we said that " 'the text of § 2 [of the FAA] provides the touchstone for choosing between state-law principles and the principles of federal common law envisioned by the passage of that statute: An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law [citation], "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 . . . . Thus state law, whether of legislative or judicial

18

origin, is applicable *if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.* A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2. [Citations.] A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what . . . the state legislature cannot.' " (*Discover Bank*, *supra*, 36 Cal.4th at pp. 164–165, quoting *Perry v. Thomas* (1987) 482 U.S. 483, 492–493, fn. 9, italics added by *Discover Ban*k.)

We reasoned that our unconscionability rule prohibiting class waivers is not preempted because it applies equally to arbitration and nonarbitration agreements: "[T]he principle that class action waivers are, under certain circumstances, unconscionable as unlawfully exculpatory is a principle of California law that does not specifically apply to arbitration agreements, but to contracts generally. In other words, it applies equally to class action litigation waivers in contracts without arbitration agreements as it does to class arbitration waivers in contracts with such agreements. (See *America Online* [*Inc. v. Superior Court* (2001)] 90 Cal.App.4th [1], 17–18.)" (*Discover Bank*, *supra*, 36 Cal.4th at pp. 165–166.) In addition, we observed that in the years since *Keating* was decided, class arbitration had proven to be a viable alternative to class litigation or bilateral arbitration. (*Discover Bank*, at p. 172 and cases cited therein.)

**B.**

The high court in *Concepcion* held that the FAA preempts the unconscionability of class arbitration waivers in consumer contracts, thereby

19

abrogating *Discover Bank*. *Concepcion* involved a class action filed in federal court alleging that AT&T engaged in fraud and false advertising by charging sales tax for phones it advertised as free. The value of the claim of the class representatives, Vincent and Liza Concepcion, was $30.22. AT&T moved to compel arbitration. The arbitration agreement provided that if an arbitration award was greater than AT&T's last written settlement offer, AT&T would pay at minimum $7,500 plus twice plaintiff's attorney fees. The district court denied the motion to compel, holding that the class waiver made the arbitration agreement unconscionable under *Discover Bank* and that the $7,500 penalty did not cure the unconscionability because AT&T could always avoid the penalty by paying the face value of the claim. As the Ninth Circuit said in affirming the district court, "the maximum gain to a customer for the hassle of arbitrating a $30.22 dispute is still just $30.22." (*Laster v. AT&T Mobility LLC* (2009) 584 F.3d 849, 856.)

The Supreme Court reversed. While acknowledging that *Discover Bank*'s unconscionability rule applies equally to arbitration and nonarbitration contracts, the high court concluded that more is required to avoid FAA preemption: "the inquiry becomes more complex when a doctrine normally thought to be generally applicable, such as duress or, as relevant here, unconscionability, is alleged to have been applied in a fashion that disfavors arbitration. . . .  [A] court may not 'rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable . . . .'  [Citation.]" (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1747].)

"An obvious illustration of this point," *Concepcion* said, "would be a case finding unconscionable or unenforceable as against public policy consumer arbitration agreements that fail to provide for judicially monitored discovery. The rationalizations for such a holding are neither difficult to imagine nor different in kind from those articulated in *Discover Bank*. A court might reason that no

20

consumer would knowingly waive his right to full discovery, as this would enable companies to hide their wrongdoing.  Or the court might simply say that such agreements are exculpatory — restricting discovery would be of greater benefit to the company than the consumer, since the former is more likely to be sued than to sue.  See *Discover Bank*, *supra*, at 161 (arguing that class waivers are similarly one-sided).  And, the reasoning would continue, because such a rule applies the general principle of unconscionability or public-policy disapproval of exculpatory agreements, it is applicable to 'any' contract and thus preserved by § 2 of the FAA.  In practice, of course, the rule would have a disproportionate impact on arbitration agreements; but it would presumably apply to contracts purporting to restrict discovery in litigation as well." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1747].)  The high court added that "[t]he same argument might apply to a rule classifying as unconscionable arbitration agreements that fail to abide by the Federal Rules of Evidence, or that disallow an ultimate disposition by a jury (perhaps termed 'a panel of twelve lay arbitrators' . . . )." (*Ibid.*)

Such unconscionability rules, " 'aimed at destroying arbitration' or 'demanding procedures incompatible with arbitration,' " would contravene the FAA's "overarching purpose" of "ensur[ing] the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1748].)  Similarly, the high court reasoned, "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." (*Ibid.*)  According to *Concepcion*, classwide arbitration interferes with fundamental attributes of arbitration in several ways.

First, classwide arbitration "sacrifices the principal advantage of arbitration — its informality — and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." (*Concepcion*, *supra*, 563 U.S.

at p. __ [131 S.Ct. at p. 1751].) " 'In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes.' [Citation.]" (*Ibid.*) Classwide arbitration, by contrast, is a slower process because "before an arbitrator may decide the merits of a claim in classwide procedures, he must first decide, for example, whether the class itself may be certified, whether the named parties are sufficiently representative and typical, and how discovery for the class should be conducted." (*Ibid.*)

Second, "class arbitration *requires* procedural formality" because of due process concerns. (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1751]; see *ibid.* ["The [American Arbitration Association's] rules governing class arbitrations mimic the Federal Rules of Civil Procedure for class litigation."].) "If procedures are too informal, absent class members would not be bound by the arbitration. For a class-action money judgment to bind absentees in litigation, class representatives must at all times adequately represent absent class members, and absent members must be afforded notice, an opportunity to be heard, and a right to opt out of the class. . . . [¶] We find it unlikely that in passing the FAA Congress meant to leave the disposition of these procedural requirements to an arbitrator." (*Id.* at pp. __–__ [131 S.Ct. at pp. 1751–1752].)

"Third, class arbitration greatly increases risks to defendants" and "is poorly suited to the higher stakes of class litigation" because of the lack of judicial review. (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1752].) "[I]n class-action arbitration huge awards (with limited judicial review) will be entirely predictable, thus rendering arbitration unattractive. It is not reasonably deniable that requiring consumer disputes to be arbitrated on a class-wide basis will have a

22

substantial deterrent effect on incentives to arbitrate." (*Id.* at p. __, fn. 8 [131 S.Ct. at p. 1752, fn. 8].)

The high court concluded: "Because it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' [citation], California's *Discover Bank* rule is preempted by the FAA." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1753].)

## C.

Sonic contends that the FAA as construed by *Concepcion* preempts our holding in *Sonic I* that a waiver of Berman procedures in an arbitration agreement is, in and of itself, unconscionable and contrary to public policy. Sonic points to our acknowledgment that the usual time between the filing of a complaint with the Labor Commissioner and the conclusion of a Berman hearing is four to six months. (*Sonic I*, *supra*, 51 Cal.4th at p. 681, fn. 5.) Sonic then underscores *Concepcion*'s observation that "in *Preston v. Ferrer*, holding preempted a state-law rule requiring exhaustion of administrative remedies before arbitration, we said: 'A prime objective of an agreement to arbitrate is to achieve "streamlined proceedings and expeditious results," ' which objective would be 'frustrated' by requiring a dispute to be heard by an agency first. 552 U.S., at 357–358. That rule, we said, would 'at the least, hinder speedy resolution of the controversy.' *Id.*, at 358." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct at p. 1749], fn. omitted.) We agree with Sonic that the FAA as construed by *Concepcion* preempts *Sonic I*'s rule categorically prohibiting waiver of a Berman hearing in arbitration agreements. Accordingly, we overrule the contrary holding in *Sonic-Calabasas A, Inc. v. Moreno*, *supra*, 51 Cal.4th 659.

In *Sonic I*, we distinguished *Preston* on grounds that, after *Concepcion*, are no longer dispositive of the preemption issue before us. *Preston* involved a dispute between Ferrer, a television personality, and Preston, an attorney, over

23

fees that Ferrer allegedly owed Preston. Ferrer claimed that the contract between him and Preston was invalid because Preston had acted as a personal manager without a license. In addition, Ferrer argued that despite an arbitration agreement in the contract, California's Talent Agency Act (TAA) gave the Labor Commissioner primary jurisdiction to resolve such disputes, with a trial de novo available if either party appeals. (§ 1744, subd. (a).) *Sonic I* observed that *Preston* followed a line of cases establishing that when a party subject to an arbitration agreement challenges the contract as a whole and not merely the arbitration clause, it is the arbitrator who decides the validity of the contract. (*Sonic I*, *supra*, 51 Cal.4th at pp. 689–690; accord, *Preston*, *supra*, 552 U.S. at p. 353; see also *Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440, 446; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395, 403–404.)

*Sonic I* explained that the present case was distinguishable from *Preston* because "the challenge is to a portion of the arbitration agreement — the Berman waiver — as contrary to public policy and unconscionable, rather than to the contract as a whole. . . . These cases are distinguished not merely because of the nature of the litigants' challenges, but also because of the fundamental differences between the two statutory regimes at issue. The statute in *Preston*, the TAA, merely lodges primary jurisdiction in the Labor Commissioner, and does not come with the same type of statutory protections as are found in the Berman hearing and posthearing procedures discussed above. In fact, notwithstanding Ferrer's argument that those in his position would be deprived of the Labor Commissioner's expertise (*Preston*, *supra*, 552 U.S. at p. 358), the *Preston* court recognized that section 1700.45 explicitly authorizes predispute agreements that allow parties to bypass the Labor Commissioner to resolve TAA issues through arbitration, albeit with certain conditions that could not lawfully be applied in that

24

case (*Preston*, at p. 356). A predispute agreement that provides for such arbitration of TAA disputes, therefore, cannot be unconscionable or contrary to public policy. This is in marked contrast to the Berman hearing statutes, which have no comparable provision authorizing arbitration agreements that bypass the Labor Commissioner, and which we have construed as not permitting such agreements as a condition of employment." (*Sonic I*, *supra*, 51 Cal.4th at p. 692, fn. omitted.)

We now re-examine *Sonic I*'s conclusion in light of *Concepcion*'s precept that "efficient, streamlined procedures" is a fundamental attribute of arbitration with which state law may not interfere. (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1749].) As noted, *Sonic I* distinguished *Preston* on the ground that predispute waiver of the administrative procedure at issue in *Preston* was expressly authorized by the TAA and thus "cannot be unconscionable or contrary to public policy." (*Sonic I*, *supra*, 51 Cal.4th at p. 692.) *Concepcion*, unlike *Preston*, did address unconscionability, and the high court made clear that courts cannot impose unconscionability rules that interfere with arbitral efficiency, including rules forbidding waiver of administrative procedures that delay arbitration. (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct at p. 1749].) The high court responded to the argument that "class proceedings are necessary to prosecute small-dollar claims that might otherwise slip through the legal system" by asserting that "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." (*Id.* at p. __ [131 S.Ct. at p. 1753].) The same logic applies to *Sonic I*'s rule categorically prohibiting waiver of a Berman hearing. Because a Berman hearing causes arbitration to be substantially delayed, the unwaivability of such a hearing, even if desirable as a matter of contractual fairness or public policy, interferes with a fundamental attribute of arbitration — namely, its objective " 'to achieve "streamlined

25

proceedings and expeditious results." ' " (*Concepcion*, at p. __ [131 S.Ct. at p. 1749], quoting *Preston*, *supra*, 552 U.S. at p. 357.) *Sonic I*'s rule is thus preempted by the FAA.

Moreno and the Labor Commissioner as amicus curiae contend that the delay contemplated here presents no obstacle to accomplishing the objectives of the FAA. In his briefing, Moreno says: "While the facilitation of streamlined proceedings is an important purpose of the FAA, it is unequivocally clear that requiring arbitration proceedings to go forward at once, without any postponement or delay, regardless of the existence of generally applicable state contract law grounds supporting a discrete challenge to the enforceability of an arbitration agreement, is not a 'fundamental attribute' of arbitration. Thus, a defense of fraud, duress or unconscionability as to some specific provision of the arbitration agreement will require the postponement of arbitration while the validity of the defense is adjudicated. 'If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4.' (*Rent-A-Center West, Inc. v. Jackson*, 561 U.S. __, __ [130 S.Ct. 2772, 2778] (2010).) Thus, the policy of promoting streamlined arbitration proceedings must yield to the assertion of a ground for revocation of a contract under the § 2 savings clause. This is necessary because the § 2 savings clause recognizes that implementation of a state policy aimed at preventing the unfairness of enforcing an arbitration agreement procured by fraud or duress, or a provision within the agreement that is unconscionable or that violates public policy, trumps the purpose of facilitating streamlined arbitration proceedings."

It is one thing to acknowledge that the arbitration process must permit time to adjudicate state-law defenses under the FAA's savings clause. But that is different from asserting that the FAA therefore permits state law to categorically

26

forbid waiver of administrative procedures that significantly delay the commencement of arbitration. To be sure, the parties to a contract must have an opportunity to determine whether the arbitration agreement should be enforced; the FAA does not require arbitration when there are valid contract defenses to the enforcement of the arbitration agreement. But it does not follow that the FAA, as interpreted by *Concepcion*, permits additional delay that results not from adjudicating whether there is an enforceable arbitration agreement, but from an administrative scheme to effectuate state policies unrelated to the agreement's enforceability. Moreno's argument that the former implies the latter is unpersuasive.

In sum, we hold that *Sonic I*'s rule prohibiting waiver of a Berman hearing is preempted by the FAA.

## IV.

Although we conclude that the FAA preempts a state-law rule categorically requiring arbitration to be preceded by a Berman hearing, our holding does not fully resolve the unconscionability claim in this case. In his opposition to the petition to compel arbitration, Moreno stated as an affirmative defense that "[i]f the arbitration agreement between the parties is construed as absolutely prohibiting Respondent from exercising [his] statutory right to initially invoke the non-binding or administrative remedy afforded by the Labor Commissioner, then the arbitral scheme crafted by Petitioner fails to provide an arbitral forum in which employees can fully and effectively vindicate their statutory rights to recover unpaid wages, and is thus contrary to public policy, unconscionable and unenforceable." Because *Sonic I* concluded categorically that arbitration must be preceded by a Berman hearing and that the petition to compel arbitration was premature, we had no occasion to address whether, without a Berman hearing, Moreno can vindicate his right to recover unpaid wages under this particular arbitral scheme. Moreover,

27

we did not address whether any barrier to vindicating such rights would make the arbitration agreement unconscionable or otherwise unenforceable under California law and, if so, whether such a rule would be preempted by the FAA. We turn now to these questions.

## A.

We begin by noting that after *Concepcion*, unconscionability remains a valid defense to a petition to compel arbitration. Quoting the FAA's saving clause, *Concepcion* reaffirmed that the FAA "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract' " (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1746], quoting 9 U.S.C. § 2), including " 'generally applicable contract defenses, such as fraud, duress, or unconscionability' [citation]" (*Concepcion*, at p. __ [131 S.Ct. at p. 1746]). Although courts may not rewrite agreements and impose terms to which neither party has agreed, it has long been the proper role of courts enforcing the common law to ensure that the terms of a bargain are not unreasonably harsh, oppressive, or one-sided. (See *A&M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 485–493 (*A&M Produce*); *Williams v. Walker-Thomas Furniture Co.* (D.C. Cir. 1965) 350 F.2d 445 (*Walker-Thomas Furniture*); *Henningsen v. Bloomfield Motors, Inc.* (N.J. 1960) 161 A.2d 69.) After *Concepcion*, the exercise of that judicial function as applied to arbitration agreements remains intact, as the FAA expressly provides.

What is new is that *Concepcion* clarifies the limits the FAA places on state unconscionability rules as they pertain to arbitration agreements. It is well-established that such rules must not facially discriminate against arbitration and must be enforced evenhandedly. *Concepcion* goes further to make clear that such rules, even when facially nondiscriminatory, must not disfavor arbitration *as applied* by imposing procedural requirements that "interfere[] with fundamental

28

attributes of arbitration," especially its " 'lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes.' [Citation.]" (*Concepcion*, *supra*, 563 U.S. at pp. __, __ [131 S.Ct.at pp. 1748, 1751].)  As the high court explained, if facial neutrality or evenhanded enforcement were the only principles limiting the scope of permissible state law defenses to arbitration, then a state court could — on grounds of unconscionability or public policy — compel the adoption of an arbitration procedure that would be arbitration in name only.  It could impose judicially monitored discovery, evidentiary rules, jury trials, or other procedures that mimic court proceedings, and thereby undermine the FAA's purpose of encouraging arbitration as an efficient alternative to litigation.  (*Id.* at p. __ [131 S.Ct. at p. 1747].)

Importantly, state-law rules that do not "interfere[] with fundamental attributes of arbitration" (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1748]) do not implicate *Concepcion*'s limits on state unconscionability rules. As our cases have held, such rules may address issues that arise uniquely in the context of arbitration.  In *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 826–827 (*Scissor-Tail*), for example, we held unconscionable a provision in an arbitration agreement that effectively gave the party imposing an adhesive contract the right to choose a biased arbitrator.  In addition, we held in *Armendariz* that because arbitrators, unlike judges, are paid by the parties, an equal division of costs between employer and employee has the potential in practice of being unreasonably one-sided or burdening an employee's exercise of statutory rights. (*Armendariz, supra*, 24 Cal.4th at pp. 107–113.)  As these examples suggest, a facially neutral state-law rule is not preempted simply because its evenhanded application "would have a disproportionate impact on arbitration agreements." (*Concepcion*, at p. __ [131 S.Ct. at p. 1747].)  Under *Concepcion*, a state-law rule

29

is preempted when its impact is such that it interferes with fundamental attributes of arbitration. (*Id.* at p. __ [131 S.Ct. at p. 1748].)

Moreover, there are other ways an arbitration agreement may be unconscionable that have nothing to do with fundamental attributes of arbitration. In *Little*, for example, we found unconscionable a $50,000 threshold for an arbitration appeal that decidedly favored defendants in employment contract disputes. (*Little*, *supra*, 29 Cal.4th at pp. 1071–1074.) In *Harper v. Ultimo* (2003) 113 Cal.App.4th 1402, 1407, the court found unconscionable an arbitration agreement with a damages limitation clause under which "the customer does not even have the theoretical *possibility* he or she can be made whole." And in *Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771, 799–800 (*Ajamian*), the court found unconscionable an arbitration agreement that, among other things, "impos[ed] upon [the employee] the obligation to pay [the employer's] attorney fees if [the employer] prevails in the proceeding, without granting her the right to recoup her own attorney fees if she prevails."

Consider also the form of unconscionability identified in *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77 (*Gutierrez*). There, the plaintiff entered into an automobile lease agreement with defendant automobile dealer. He subsequently sued the dealer over alleged fraud in the transaction. The adhesive agreement contained an inconspicuous arbitration clause. (*Id.* at pp. 83–84.) The Court of Appeal found that, based on the American Arbitration Association rules in effect at the time the defendant moved to compel arbitration, the plaintiff would have had to pay $8,000 in administrative fees to initiate the arbitration. (*Id.* at pp. 90–91.) It was undisputed that such fees exceeded the plaintiff's ability to pay. (*Id.* at p. 91.) In holding this aspect of the arbitration agreement unconscionable, *Gutierrez* said: "We conclude that where a consumer enters into an adhesive contract that mandates arbitration, it is unconscionable to condition

30

that process on the consumer posting fees he or she cannot pay.  It is self-evident that such a provision is unduly harsh and one-sided, defeats the expectations of the non-drafting party, and shocks the conscience.  While arbitration may be within the reasonable expectations of consumers, a process that builds prohibitively expensive fees into the arbitration process is not.  (See *Patterson v. ITT Consumer Financial Corp.* [(1993) 14 Cal.App.4th 1659, 1665].)  To state it simply:  it is substantively unconscionable to require a consumer to give up the right to utilize the judicial system, while imposing arbitral forum fees that are prohibitively high. Whatever preference for arbitration might exist, it is not served by an adhesive agreement that effectively blocks every forum for the redress of disputes, including arbitration itself."  (*Id.* at pp. 89–90, fns. omitted.)

As the cases above illustrate, the core concern of unconscionability doctrine is the " ' "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." ' " (*Sonic I*, *supra*, 51 Cal.4th at pp. 684–685; *Walker-Thomas Furniture*, *supra*, 350 F.2d at p. 449.)  Unconscionability doctrine ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as " ' "overly harsh" ' " (*Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1532 (*Stirlen*)), "unduly oppressive" (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 925 (*Perdue*)), " 'so one-sided as to "shock the conscience" ' " (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (2012) 55 Cal.4th 223, 246 (*Pinnacle*)), or "unfairly one-sided" (*Little*, *supra*, 29 Cal.4th at p. 1071).  All of these formulations point to the central idea that unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain" (*Schnuerle v. Insight Communications Co.* (Ky. 2012) 376 S.W.3d 561, 575 (*Schnuerle*)), but with terms that are "unreasonably favorable to the more powerful party" (8 Williston on Contracts (4th ed. 2010) § 18.10, p. 91).  These include "terms that

31

impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction." (*Ibid.*)

After *Concepcion*, courts may continue to apply unconscionability doctrine to arbitration agreements. (See *Schnuerle*, *supra*, 376 S.W.2d at pp. 579–580 [*Concepcion* does not preempt holding that confidentiality provision of arbitration agreement is unconscionable]; *In re Checking Account Overdrafts Litigation* (11th Cir. 2012) 685 F.3d 1269, 1280–1283 [*Concepcion* does not preempt holding under South Carolina law that fee-shifting provision in arbitration agreement is unconscionable].) As the FAA contemplates in its savings clause (9 U.S.C. § 2), courts may examine the terms of adhesive arbitration agreements to determine whether they are unreasonably one-sided. What courts may not do, in applying unconscionability doctrine, is to mandate procedural rules that are inconsistent with fundamental attributes of arbitration, even if such rules are "desirable for unrelated reasons." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1753].)

**B.**

Under *Concepcion*, the FAA preempts *Sonic I*'s rule that waiver of a Berman hearing necessarily renders an adhesive arbitration agreement unconscionable regardless of what the terms of the agreement provide or how the agreement was formed. State law may not categorically require arbitration to be preceded by an administrative hearing because the hearing interferes with arbitral efficiency by substantially delaying arbitration. Thus, the fact that arbitration supplants an administrative hearing cannot be a basis for finding an arbitration agreement unconscionable.

32

But the waivability of a Berman hearing in favor of arbitration does not end the unconscionability inquiry. The Berman statutes include various features designed to lower the costs and risks for employees in pursuing wage claims, including procedural informality, assistance of a translator, use of an expert adjudicator who is authorized to help the parties by questioning witnesses and explaining issues and terms, and provisions on fee shifting, mandatory undertaking, and assistance of the Labor Commissioner as counsel to help employees defend and enforce any award on appeal. Waiver of these protections does not necessarily render an arbitration agreement unenforceable, nor does it render an arbitration agreement unconscionable per se. But waiver of these protections in the context of an agreement that does not provide an employee with an accessible and affordable arbitral forum for resolving wage disputes may support a finding of unconscionability. As with any contract, the unconscionability inquiry requires a court to examine the totality of the agreement's substantive terms as well as the circumstances of its formation to determine whether the overall bargain was unreasonably one-sided. In the present case, we remand to the trial court to conduct this fact-specific inquiry.

In evaluating the substantive terms of an arbitration agreement, a court applying unconscionability doctrine must consider not only what features of dispute resolution the agreement eliminates but also what features it contemplates. Here, the agreement between Sonic and Moreno says that arbitration shall be conducted by a "retired California Superior Court Judge." The agreement further provides for a right to conduct discovery and take depositions, and it makes applicable, "to the extent applicable in civil actions in California courts[,] . . . all rules of pleading (including the right of demurrer), all rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, and judgment under Code of Civil Procedure section 631.8." At

33

either party's request, an arbitration award may be reviewed by a second arbitrator who will, "as far as practicable, proceed according to the law and procedures applicable to appellate review by the California Court of Appeal of a civil judgment following court trial." Moreno contends that these terms of arbitration, which impose many of the formalities of litigation, do not offer a "speedy, informal, and affordable method of resolving wage claims" (*Cuadra*, *supra*, 17 Cal.4th at p. 858) and unconscionably prevent him from pursuing his claim.

On the other hand, the agreement on its face does not necessarily reveal many of the particulars of the arbitration process that Sonic has adopted. (See, e.g., *Truly Nolen of America v. Superior Court* (2012) 208 Cal.App.4th 487, 494–495 [examining American Arbitration Association rules to determine the nature of the arbitration agreement].) It may be, for example, that the actual arbitration process Sonic uses has rules that enable an employee to obtain prompt, affordable, and enforceable resolution of a wage claim. Indeed, we recognized in *Sonic I* that "[i]t may be possible for an arbitration system to be designed so that it provides an employee all the advantages of the Berman hearing and posthearing protections." (*Sonic I*, *supra*, 51 Cal.4th at p. 681, fn. 4.) At oral argument here and in *Sonic I*, counsel for Sonic said that the present agreement is so designed. According to counsel, the agreement authorizes or mandates cost savings comparable to what an employee would realize through the Berman process, it requires Sonic to post an undertaking to ensure that an employee can collect an arbitral award, and it provides for a translator if needed. (See also *ibid.* ["At oral argument, Sonic's counsel argued that its arbitration in fact resembled a Berman hearing in its informality, and the arbitrator would or might incorporate Berman-like protections such as one-way fee shifting."].) These facts about the arbitration process are not in the record before us, but they may be introduced by Sonic and considered by the trial court on remand. Civil Code section 1670.5, subdivision (b) provides that

34

"[w]hen it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination," and we have said, in construing this statute, that "a claim of unconscionability often cannot be determined merely by examining the face of the contract." (*Perdue*, *supra*, 38 Cal.3d at p. 926.)

We emphasize that there is no single formula for designing an arbitration process that provides an effective and low-cost approach to resolving wage disputes. There are potentially many ways to structure arbitration, without replicating the Berman protections, so that it facilitates accessible, affordable resolution of wage disputes. We see no reason to believe that the specific elements of the Berman statutes are the only way to achieve this goal or that employees will be unable to pursue their claims effectively without initial resort to an administrative hearing as opposed to an adequate arbitral forum. Waiver of the Berman protections will not, by itself, support a finding of unconscionability where the arbitral scheme at issue provides employees with an accessible and affordable process for resolving wage disputes. The unconscionability inquiry is not a license for courts to impose their renditions of an ideal arbitral scheme. Rather, in the context of a standard contract of adhesion setting forth conditions of employment, the unconscionability inquiry focuses on whether the arbitral scheme imposes costs and risks on a wage claimant that make the resolution of the wage dispute inaccessible and unaffordable, and thereby "effectively blocks every forum for the redress of disputes, including arbitration itself." (*Gutierrez*, *supra*, 114 Cal.App.4th at p. 90.)

In *Sonic I*, we acknowledged that outside the context of an adhesive form contract, other considerations may inform the unconscionability inquiry. Evidence that a Berman waiver is part of a nonstandard contract freely negotiated by parties

35

of comparable bargaining power, "such as may exist between an employer and a highly compensated executive employee," weighs against a finding of unconscionability. (*Sonic I*, *supra*, 51 Cal.4th at p. 682, fn. 7.) Whether Moreno, who was not a low-wage worker at Sonic and whose wage claim alleges " '[v]acation wages for 63 days . . . at the rate of $441.29 per day' " (*id.* at p. 670), had comparable bargaining power or freely negotiated his contract are matters for the trial court to determine on remand. Further, when a negotiated or nonstandard contract is at issue, terms of employment unrelated to arbitration may confer substantial benefits that inform the fairness of requiring the employee to surrender statutory protections in favor of arbitration. In addition, Civil Code section 1670.5, subdivision (b) indicates that any evidence concerning the "commercial setting, purpose, and effect" of the agreement is pertinent to the inquiry.

In sum, unconscionability doctrine does not mandate the adoption of any particular form of dispute resolution mechanism, and courts may not decline to enforce an arbitration agreement simply on the ground that it appears to be a bad bargain or that one party could have done better. Unconscionability doctrine is instead concerned with whether the agreement is unreasonably favorable to one party, considering in context "its commercial setting, purpose, and effect." (Civ. Code, § 1670.5, subd. (b).) In applying the doctrine to the arbitration agreement here, the trial court may consider as one factor Moreno's surrender of the Berman protections in their entirety, although that factor alone does not necessarily render the agreement unconscionable. Because it may not have been clear before our decision today that evidence concerning the specific arbitral scheme at issue in this case is pertinent to the unconscionability inquiry, the parties will have the opportunity to present such evidence in order to inform the trial court's unconscionability determination. "Since unconscionability is a contract defense," it will be Moreno's burden on remand to prove "that an arbitration provision is

36

unenforceable on that ground." (*Chin v. Advanced Fresh Concepts Franchise Corp.* (2011) 194 Cal.App.4th 704, 708.)  Further, the Labor Commissioner may intervene in any proceedings when it appears that his or her jurisdiction is being usurped by an unenforceable arbitration agreement.  (See *City of San Jose v. International Assn. of Firefighters, Local 230* (2009) 178 Cal.App.4th 408, 412.)

## C.

The unconscionability doctrine we have stated above is not preempted by the FAA.  In holding that an employee's surrender of Berman protections in their totality may be considered as a factor in determining whether an arbitration agreement is unconscionable, our doctrine does not facially discriminate against arbitration.  It applies equally to arbitration and nonarbitration agreements that require employees to forgo the Berman protections in resolving wage claims.  In addition, our unconscionability doctrine as applied does not pose an obstacle to the achievement of the FAA's objectives as construed in *Concepcion*.  Because the Berman statutes promote the very objectives of "informality," "lower costs," "greater efficiency and speed," and use of "expert adjudicators" that the high court has deemed "fundamental attributes of arbitration" (*Concepcion*, *supra*, 563 U.S. at pp. __, __ [131 S.Ct. at pp. 1748, 1751]; see *Cuadra*, *supra*, 17 Cal.4th at p. 858), the case-by-case application of unconscionability doctrine to agreements that require employees to *forgo* such benefits will, if anything, tend to promote the FAA's objectives rather than lead to any increase in cost, procedural rigor, complexity, or formality.  As noted, there are potentially many ways to design arbitration, consistent with its fundamental attributes, so that it is affordable and accessible for wage claimants.  Sonic argues that the arbitration process at issue here fits this description, and Sonic will have the opportunity on remand to provide evidence in support of its contention.

37

The fact that the FAA preempts *Sonic I*'s rule requiring arbitration of wage disputes to be preceded by a Berman hearing does not mean that a court applying unconscionability analysis may not consider the value of benefits provided by the Berman statutes, which go well beyond the hearing itself. The FAA preempts *Sonic I*'s rule because it categorically favors a particular form of dispute resolution — the Berman hearing — over arbitration and creates an immovable obstacle to a streamlined arbitral process. By contrast, the unconscionability analysis we describe today is not premised on the superiority of the Berman hearing as a dispute resolution forum. Our rule contemplates that arbitration, no less than an administrative hearing, can be designed to achieve speedy, informal, and affordable resolution of wage claims and that the features of arbitration set forth in an agreement properly inform the unconscionability inquiry. *Sonic I*'s rule runs afoul of *Concepcion* because it interposes the Berman hearing as an unwaivable prerequisite to arbitration and thereby significantly delays the start of arbitration. The rule we adopt today, which makes clear that the Berman hearing is waivable, does not delay arbitration or otherwise interfere with fundamental attributes of arbitration. It simply requires an adhesive arbitration agreement that compels the surrender of Berman protections as a condition of employment to provide for accessible, affordable resolution of wage disputes.

The distinction between state-law rules that undermine fundamental attributes of arbitration and state-law rules that do not may be further elucidated by considering an example drawn from the facts of *Concepcion*. As noted, *Concepcion* held that because class proceedings undermine arbitration's fundamental attributes of informality and efficiency, the FAA preempts a state unconscionability rule forbidding waiver of class proceedings. But *Concepcion* did not rule out other ways to enable consumers "to prosecute small-dollar claims that might otherwise slip through the legal system." (*Concepcion*, *supra*, 563 U.S.

at p. __ [131 S.Ct. at p. 1753].) The high court noted that the arbitration agreement at issue there "provides that AT&T will pay claimants a minimum of $7,500 and twice their attorney's fees if they obtain an arbitration award greater than AT&T's last settlement offer" and then observed that "[t]he District Court found this scheme sufficient to provide incentive for the individual prosecution of meritorious claims that are not immediately settled, and the Ninth Circuit admitted that aggrieved customers who filed claims would be 'essentially guarantee[d]' to be made whole, [citation]." (*Ibid.*)

Suppose that, in light of *Concepcion*, a state legislature seeking to protect small-dollar claimants were to enact a generally applicable, unwaivable statute similar to the provision just described, requiring a defendant to pay a penalty plus attorney fees if a plaintiff with a low-value claim obtains an award through litigation or arbitration greater than the defendant's last settlement offer. Nothing in *Concepcion* suggests that such a statute — which is designed to achieve the same objective as a rule forbidding class waivers but does not interfere with fundamental attributes of arbitration — would be preempted by the FAA. Moreover, the fact that the statute would render invalid an arbitration (or nonarbitration) agreement at odds with the penalty scheme — and thus leave the parties to their usual rights and remedies under state law, including class proceedings — does not mean that the statute has somehow circumvented the FAA's preemption of state-law rules forbidding class waivers.

The unconscionability rule we set forth today stands on exactly the same legal footing. Many of the Berman protections are situated no differently than state laws concerning attorney fee-shifting, assistance of counsel, or other rights designed to benefit one or both parties in civil litigation. The FAA's preemption of any state-law rule categorically forbidding waiver of formal discovery, jury factfinding, class procedures, or civil litigation generally (see *Concepcion*, *supra*,

39

563 U.S. at p. __ [131 S.Ct. at p. 1747]) does not mean that a party's surrender of specific statutory benefits that would otherwise apply to certain kinds of claims becomes a prohibited consideration in deciding whether an arbitration agreement is unconscionable.  Although the mere substitution of arbitration for litigation does not itself entail the loss of a benefit (see *Armendariz*, *supra*, 24 Cal.4th at pp. 98–99; *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.* (1985) 473 U.S. 614, 626–628 (*Mitsubishi Motors*)), an assessment of what a party has lost through an arbitration agreement often involves consideration of what specific rights, protections, or benefits would otherwise apply.  (See, e.g., *Armendariz*, at pp. 110–111 ["[W]hen an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any *type* of expense that the employee would not be required to bear if he or she were free to bring the action in court."]; *Serpa v. California Surety Investigations, Inc.* (2013) 215 Cal.App.4th 695, 709–710 (*Serpa*) [finding arbitration agreement unconscionable because it deprived employee of a favorable fee-shifting rule under the Fair Employment and Housing Act (FEHA)]; *Ajamian*, *supra*, 203 Cal.App.4th at p. 800 [finding arbitration agreement unconscionable because it "arguably strips [the employee] of her right to recover attorney fees under her California statutory claims" and "imposes on her the obligation to pay [the employer's] attorney fees where she would have no such obligation under at least one of her California statutory claims"].)

In this case, the types of benefits that would otherwise apply are ones designed to promote, not undermine, the speed, economy, informality, and efficiency of dispute resolution.  Our unconscionability analysis does not pose an obstacle to the FAA's objectives any more than if the Legislature were to enact a statute requiring any dispute resolution mechanism, including arbitration, used in lieu of the Berman procedures to have features that mitigate risks and costs for

40

wage claimants, so long as those features do not interfere with fundamental attributes of arbitration. Although *Concepcion* says state law cannot require a procedure that undermines fundamental attributes of arbitration "even if it is desirable for unrelated reasons" (*Concepcion*, at p. __ [131 S.Ct. at p. 1753]), this does not mean that the FAA preempts generally applicable state laws that do *not* undermine fundamental attributes of arbitration.

To be sure, when a court invalidates an arbitration agreement on unconscionability grounds, it may be said that unconscionability doctrine results in a refusal to enforce arbitration agreements "according to their terms." (*Concepcion*, *supra*, at p. __ [131 S.Ct. at p. 1748].) It also may be said that unconscionability doctrine results in arbitration rules that "increase[] risks to defendants" or lessen a defendant's incentives to arbitrate. (*Id.* at p. __ & fn. 8 [131 S.Ct. at p. 1752 & fn. 8].) But that is true of *any* generally applicable principle of unconscionability as applied to an adhesive arbitration agreement. For example, an adhesive agreement that gives the employer the right to choose a biased arbitrator is unconscionable (see *Scissor-Tail*, *supra*, 28 Cal.3d at pp. 826–827), even though such a rule does not enforce the agreement according to its terms and increases risk to the employer, who would prefer to pick the arbitrator. The FAA plainly does not preempt such a state-law rule. The directive to enforce arbitration "in accordance with the terms of the agreement," which appears in section 4 of the FAA (9 U.S.C. § 4), logically applies *after* a court has determined that there is an "enforceable" agreement under section 2 of the FAA (9 U.S.C. § 2). Were it otherwise, we would attribute to Congress an irrational intent to negate, through section 4, the savings clause it wrote into section 2. Neither a mere refusal to enforce an arbitration agreement according to its terms nor increased risk to a defendant can, by itself, serve as a principle that distinguishes between an unconscionability rule that is preempted and one that is not.

41

In sum, we do not hold that any time arbitration is substituted for a judicial or administrative forum, there is a loss of benefits. Nor do we hold that the proponent of arbitration will invariably have to justify the agreement through provision of benefits comparable to those otherwise afforded by statute. Both California and federal law treat the substitution of arbitration for litigation as the mere replacement of one dispute resolution forum for another, resulting in no inherent disadvantage. (See *Armendariz*, *supra*, 24 Cal.4th at pp. 98–99; *Mitsubishi Motors*, *supra*, 473 U.S. at pp. 626–628.) But where, as here, a particular class has been legislatively afforded specific protections in order to mitigate the risks and costs of pursuing certain types of claims, and to the extent those protections do not interfere with fundamental attributes of arbitration, an arbitration agreement requiring a party to forgo those protections may properly be understood not only to substitute one dispute resolution forum for another, but also to compel the loss of a benefit. The benefit lost is not dispositive but may be one factor in an unconscionability analysis.

## V.

While this case was pending before our court, the United States Supreme Court decided another arbitration case, *American Express Co. v. Italian Colors Restaurant* (2013) 570 U.S. __ [133 S.Ct. 2304] (*Italian Colors*). We requested supplemental briefing from the parties on the significance of *Italian Colors* to the present dispute. Having reviewed the high court's opinion and the parties' submissions, we do not believe *Italian Colors* alters our conclusions above.

In *Italian Colors*, the owner of a small restaurant sought to bring a class action suit alleging that American Express had violated the Sherman Act by "us[ing] its monopoly power in the market for charge cards to force merchants to accept credit cards at rates approximately 30% higher than the fees for competing credit cards." (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2308].)

42

American Express moved to compel individual, bilateral arbitration pursuant to a standardized agreement with an express class action waiver. In response, the plaintiff merchants submitted a declaration from an economist showing that the cost of an expert analysis necessary to prove the antitrust claims would far exceed the maximum recovery for any individual plaintiff. On that basis, the plaintiffs argued that individual arbitration would be prohibitively costly and that enforcing the class action waiver would prevent them from effectively vindicating their rights under the Sherman Act. The high court rejected the plaintiffs' argument and upheld the arbitration agreement. (*Id.* at p. __ [133 S.Ct. at p. 2312].)

The high court explained that the principle that the FAA requires courts to enforce arbitration agreements according to their terms "holds true for claims that allege a violation of a federal statute, unless the FAA's mandate has been ' "overridden by a contrary congressional command." ' " (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2309], citations omitted.) The high court found no contrary congressional command evident in the Sherman Act, observing that "the antitrust laws do not guarantee an affordable procedural path to the vindication of every claim." (*Id.* at p. __ [133 S.Ct. at p. 2309]; see *id.* at p. __ [133 S.Ct. at p. 2309] ["The antitrust laws do not 'evinc[e] an intention to preclude a waiver' of class-action procedure. [Citation.]"].) Further, the high court said: "Nor does congressional approval of [Federal Rule of Civil Procedure] 23 establish an entitlement to class proceedings for the vindication of statutory rights." (*Id.* at p. __ [133 S.Ct. at p. 2309].)

The high court then addressed the plaintiffs' contention that "a judge-made exception to the FAA . . . serves to harmonize competing federal policies by allowing courts to invalidate agreements that prevent the 'effective vindication' of a federal statutory right. Enforcing the waiver of class arbitration bars effective vindication, [the plaintiffs] contend, because they have no economic incentive to

43

pursue their antitrust claims individually in arbitration." (*Italian Colors*, *supra*, 570 U.S.at p. __ [133 S. Ct. at p. 2310].)  According to the high court, the "effective vindication" exception "finds its origin in the desire to prevent 'prospective waiver of a party's right to pursue statutory remedies,' [(*Mitsubishi Motors*, *supra*, 473 U.S. at p. 637, fn. 19)] (emphasis added).  That would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights.  And it would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable.  [Citation.]  But the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy.  [Citation.]  The class-action waiver merely limits arbitration to the two contracting parties.  It no more eliminates those parties' right to pursue their statutory remedy than did federal law before its adoption of the class action for legal relief in 1938, [citations].  Or, to put it differently, the individual suit that was considered adequate to assure 'effective vindication' of a federal right before adoption of class-action procedures did not suddenly become 'ineffective vindication' upon their adoption." (*Italian Colors*, at p. __ [133 S.Ct. at pp. 2310–2311], fns. omitted.)

We believe the reasoning of *Italian Colors* does not alter the unconscionability analysis applicable to the present case.  As an initial matter, *Italian Colors* involved the harmonization of the FAA with other federal law; it was not a preemption case.  The high court thus had no occasion to consider the well-established principle that "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.' " (*Arizona v. United States* (2012) 567 U.S. __, __ [132 S.Ct. 2492, 2501]; see *Chamber of Commerce v. Whiting* (2011) 563 U.S. __, __ [131 S.Ct. 1968, 1985] ["Our precedents 'establish that a high threshold must be

44

met if a state law is to be preempted for conflicting with the purposes of a federal Act.' [Citation.]"].)  Laws ensuring the prompt and full payment of wages unquestionably fall within the historic police powers of the state (see *Kerr's Catering Service v. Dept. of Industrial Relations* (1962) 57 Cal.2d 319, 326–327, and cases cited therein), as does the power to police unfairly one-sided contracts of adhesion (see *Stevens v. Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 879–882 (*Stevens*), and cases cited therein).  *Italian Colors* did not construe the FAA in light of basic principles of federalism.

In any event, neither the federal antitrust laws nor Federal Rule of Procedure 23 "establish[ed] an entitlement to class proceedings for the vindication of [the] statutory rights" at issue in *Italian Colors*.  (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2309].)  According to the high court, the class waiver in *Italian Colors* could not have conflicted with other federal policy because "[n]o contrary congressional command requires us to reject the waiver of class arbitration here."  (*Id.* at p. __ [133 S.Ct. at p. 2309].)  Here, by contrast, the Legislature has "establish[ed] an entitlement" (*id.* at p. __ [133 S.Ct. at p. 2309]) to a specific set of protections in order to provide lay persons with an accessible, informal, and affordable mechanism for resolving wage claims.  Whereas the class waiver in *Italian Colors* eliminated no statutory entitlement specifically designed to help vindicate the rights at issue there, the same is not true of the waiver of statutorily provided Berman protections in this case.

Similarly, the high court's discussion of the "effective vindication" exception in *Italian Colors* — a doctrine that guides the harmonization of *federal* statutes — does not affect our analysis in the present case.  In stating that "the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy" (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2311]), the high court was proceeding on

45

the premise, established earlier in its opinion, that the "right to pursue" the antitrust remedy in that case encompassed no specific entitlement under the antitrust laws or Federal Rule of Civil Procedure 23 to a class proceeding or to "an affordable procedural path to the vindication of every claim" (*id.* at p. __ [133 S.Ct. at p. 2309]).  Here, by contrast, the Legislature adopted the Berman protections specifically to provide a "speedy, informal, and affordable method of resolving wage claims." (*Cuadra*, *supra*, 17 Cal.4th at p. 858.)  Whereas in *Italian Colors* "the individual suit that was considered adequate to assure 'effective vindication' of a federal right before adoption of class-action procedures did not suddenly become 'ineffective vindication' upon their adoption" (*Italian Colors*, at p. __ [133 S.Ct. at p. 2311]), here the Legislature enacted the Berman protections "as a means of affording an employee with a meritorious wage claim certain advantages, chiefly designed to reduce the costs and risks of pursuing a wage claim, recognizing that such costs and risks could prevent a theoretical right from becoming a reality." (*Sonic I*, *supra*, 51 Cal.4th at p. 679.)

Toward the end of its opinion in *Italian Colors*, the high court added this paragraph concerning *Concepcion*:  "Truth to tell, our decision in [*Concepcion*] all but resolves this case.  There we invalidated a law conditioning enforcement of arbitration on the availability of class procedure because that law 'interfere[d] with fundamental attributes of arbitration.'  563 U.S., at __, 131 S.Ct., at 1748.  '[T]he switch from bilateral to class arbitration,' we said, 'sacrifices the principal advantage of arbitration — its informality — and makes the process slower, more costly, and more likely to generate procedural morass than final judgment.'  *Id.*, at __, 131 S.Ct., at 1751.  We specifically rejected the argument that class arbitration was necessary to prosecute claims 'that might otherwise slip through the legal system.'  *Id.*, at __, 131 S.Ct., at 1753." (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S. Ct. at p. 2312].)  The high court ended this paragraph with a footnote

46

responding to the dissent: "In dismissing [*Concepcion*] as a case involving pre-emption and not the effective-vindication exception, the dissent ignores what that case established—that the FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims. The latter interest, we said, is 'unrelated' to the FAA. 563 U.S., at __, 131 S.Ct., at 1752–1753. Accordingly, the FAA does, contrary to the dissent's assertion [citation], favor the absence of litigation when that is the consequence of a class-action waiver, since its ' "principal purpose" ' is the enforcement of arbitration agreements according to their terms." (*Id.* at p. __, fn. 5 [133 S.Ct. at p. 2312, fn. 5].)

As indicated, the high court understood the result in *Italian Colors* to be entailed by *Concepcion*, and one can see why. *Concepcion* upheld a class arbitration waiver in the face of a *contrary* unconscionability rule because the rule interfered with fundamental attributes of arbitration. In light of *Concepcion*'s holding that class procedures interfere with fundamental attributes of arbitration, it is unsurprising that the high court in *Italian Colors* upheld a class waiver in the face of *no contrary* legislative command. But the logic that unites *Italian Colors* and *Concepcion* does not speak to whether the FAA preempts state-law protections for wage claimants that, unlike class procedures, do *not* interfere with fundamental attributes of arbitration. The high court's assertion in footnote 5 of *Italian Colors* that *Concepcion* "established . . . that the FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims" (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2312, fn. 5]) must be read in the context of the paragraph that precedes it. *Concepcion* held that the FAA preempts a state-law rule that interferes with fundamental attributes of arbitration "even if [the rule] is desirable for unrelated reasons," such as facilitating the prosecution of "small-dollar claims that might otherwise slip

47

through the legal system." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1753].) *Concepcion* did not hold that the FAA preempts state-law rules designed to facilitate prosecution of small-dollar claims even when the rules do *not* interfere with fundamental attributes of arbitration, and we decline to infer such a broad expansion of *Concepcion*'s holding from a footnote in *Italian Colors*.

Finally, the high court in *Italian Colors* ended its opinion by decrying prearbitration litigation over the expected costs of pursuing a particular legal claim or theory: "Such a preliminary litigating hurdle would undoubtedly destroy the prospect of speedy resolution that arbitration in general and bilateral arbitration in particular was meant to secure. The FAA does not sanction such a judicially created superstructure." (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2312.) Again, the high court disapproved of "[s]uch a preliminary litigating hurdle" (*ibid.*) in a statutory context where no specific legislative mandate sought to ensure the affordability of pursuing the antitrust claim at issue there. The high court had no occasion to consider a statutory context in which specific legislation does seek to ensure the affordability of pursuing a particular kind of claim. Nor did the high court in *Italian Colors* consider the savings clause in section 2 of the FAA (9 U.S.C. § 2), which plainly contemplates litigation and judicial determination of " 'generally applicable contract defenses, such as fraud, duress, or unconscionability' [citation]" (*Concepcion*, 563 U.S. at p. __ [131 S.Ct. at p. 1746]) as a prelude to enforcement of an arbitration agreement. (See *Rent-A-Center West, Inc. v. Jackson* (2010) 561 U.S. __, __ [130 S.Ct. 2772, 2778].)

In any event, we do not anticipate that our unconscionability inquiry will create "a preliminary litigating hurdle" that would delay arbitration under a valid agreement. The wage claim here is simpler than the antitrust claim at issue in *Italian Colors*, and courts here and elsewhere have routinely decided whether arbitration is affordable in a given case. (See *post*, at p. 57.) Moreover, Code of

48

Civil Procedure section 1290.2, which governs petitions to compel arbitration brought in California courts, provides that such petitions "shall be heard in a summary way in the manner and upon the notice provided by law for the making and hearing of motions . . . ." As we explained in *Rosenthal v. Great Western Financial Securities Corp.* (1996) 14 Cal.4th 394, hearing and determination " 'in the manner . . . provided by law for the . . . hearing of motions' (§ 1290.2)" generally means that "the facts are to be proven by affidavit or declaration and documentary evidence with oral testimony taken only in the court's discretion." (*Id.* at pp. 413–414.) With respect to claims of fraud, where factual differences may be difficult to resolve without making credibility determinations, oral testimony is generally appropriate. (*Id.* at p. 414.) In cases such as this one, however, there is no reason to suppose that the trial court cannot resolve the claim of unconscionability in a summary fashion based on declarations or other documentary evidence submitted in connection with a motion to compel arbitration. (See, e.g., *Gutierrez*, *supra*, 114 Cal.App.4th at pp. 90–91.)

In sum, *Italian Colors* does not alter the unconscionability analysis we set forth above. Where a state-law rule interferes with fundamental attributes of arbitration, the FAA preempts the state-law rule even if the rule is designed to facilitate prosecution of certain kinds of claims. *Concepcion* established this principle, *Italian Colors* reaffirmed it, and we apply it today to invalidate the categorical rule on waiving a Berman hearing that we adopted in *Sonic I.* Yet a court, when faced with an unconscionability claim arising from an adhesive employment contract requiring waiver of the Berman protections in their entirety, must still determine whether the overall bargain was unreasonably one-sided. This unconscionability inquiry does not, in purpose or effect, express a preference for nonarbitral as opposed to arbitral forums. To the contrary, it promotes and encourages the use of conventional bilateral arbitration as a means of low-cost,

efficient dispute resolution. Our unconscionability doctrine poses no obstacle to enforcement of arbitration agreements so long as the arbitral scheme, however designed, provides employees with an accessible, affordable process for resolving wage disputes that does not "effectively block[] every forum for the redress of [wage] disputes, including arbitration itself." (*Gutierrez*, *supra*, 114 Cal.App.4th at p. 90.)

## VI.

Justice Chin dissents from our treatment of Moreno's unconscionability claim on several grounds. To a significant extent, his dissent relitigates issues that this court has already decided to the contrary. And his only new argument — that the FAA preempts the unconscionability rule we set forth today — is unpersuasive for reasons we have discussed above and further elucidate below.

## A.

As an initial matter, Justice Chin says Moreno forfeited his right to litigate the unconscionability issue. The dissent acknowledges that Moreno asserted in the trial court, as a defense to enforcement of the arbitration agreement, that the agreement was unconscionable because it " 'fails to provide an arbitral forum in which employees can fully and effectively vindicate their statutory rights to recover unpaid wages.' " (Conc. & dis. opn., *post*, at p. 4.) The dissent insists, nevertheless, that Moreno's unconscionability claim should be deemed forfeited because "he did nothing further in the trial court to pursue either this or any other unconscionability defense." (*Ibid.*) But a similar argument failed to persuade the court in *Sonic I*. (See *Sonic I*, *supra*, 51 Cal.4th at p. 685, fn. 10; *id.* at p. 713 (conc. & dis. opn. of Chin, J.).) Moreno raised the unconscionability defense and then chose, given the state of the law at the time, to focus in the trial court on his argument that waiver of a Berman hearing was per se unconscionable and contrary

50

to public policy.  Moreno will now have the opportunity to develop his unconscionability defense in light of the principles we articulate today.

Justice Chin also characterizes our discussion of unconscionability as "dicta" and an "advisory opinion."  (Conc. & dis. opn., *post*, at pp. 1, 7.)  But this is incorrect.  "Dicta consists of observations and statements unnecessary to the appellate court's resolution of the case."  (*Garfield Medical Center v. Belshé* (1998) 68 Cal.App.4th 798, 806.)  Statements by appellate courts "responsive to the issues raised on appeal and . . . intended to guide the parties and the trial court in resolving the matter following . . . remand" are not dicta.  (*Ibid.*; see *United Steelworkers of America v. Board of Education* (1984) 162 Cal.App.3d 823, 834–835.)  Our discussion of unconscionability is responsive to whether Moreno has a viable unconscionability defense after *Concepcion*, and it is intended to guide the parties and the trial court on remand.  The discussion is neither dicta nor an advisory opinion.

## B.

The core of Justice Chin's dissent is his contention that the arbitration agreement at issue here is not unconscionable.  He advances several arguments in support of this claim.

## 1.

Justice Chin says we have improperly relaxed the unconscionability standard by using the phrase "unreasonably one-sided" instead of "so one-sided as to shock the conscience."  (Conc. & dis. opn., *post*, at p. 8.)  Justice Corrigan also favors the term "shock the conscience."  (Conc. opn., *post*, at pp. 1–2.)  But an examination of the case law does not indicate that "shock the conscience" is a different standard in practice than other formulations or that it is the one true, authoritative standard for substantive unconscionability, exclusive of all others.

In *Armendariz*, the seminal California case to examine unconscionability in the context of adhesive arbitration agreements, we relied in part on *A&M Produce*, *supra*, 135 Cal.App.3d 473, to elucidate general principles of unconscionability. (See *Armendariz*, *supra*, 24 Cal.4th at pp. 113–114.)  *A&M Produce*, which predates our arbitration cases, did not involve arbitration and made no reference to the "shock the conscience" standard.  Upon reviewing case law from a variety of jurisdictions, *A&M Produce* stated that " '[u]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " (*A&M Produce*, at p. 486, quoting *Walker-Thomas Furniture*, *supra*, 350 F.2d at p. 449.)

Some Courts of Appeal, starting with *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 214–215, have criticized the term "unreasonable" as overly subjective and have instead used the "shock the conscience" standard.  But no uniformity has emerged in our lower courts.  Some Courts of Appeal have used the "shock the conscience" standard in arbitration cases (see, e.g., *Bigler v. Harker School* (2013) 213 Cal.App.4th 727, 736; *Mission Viejo Emergency Medical Associates v. Beta Healthcare Group* (2011) 197 Cal.App.4th 1146, 1158–1159; *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.* (2010) 187 Cal.App.4th 1405, 1419), while others have not (see, e.g., *Zullo v. Superior Court* (2011) 197 Cal.App.4th 477, 484; *Olvera v. El Pollo Loco, Inc.* (2009) 173 Cal.App.4th 447, 456; *Martinez v. Master Protection Corp.* (2004) 118 Cal.App.4th 107, 113).  And still others have regarded the term "shock the conscience" as interchangeable with various other formulations.  (See, e.g., *Serpa*, *supra*, 215 Cal.App.4th at p. 703.)

As Justice Chin notes, we recently said in *Pinnacle*, an arbitration case, that "[a] contract term is not substantively unconscionable when it merely gives one

52

side a greater benefit; rather, the term must be 'so one-sided as to "shock the conscience." ' " (*Pinnacle*, *supra*, 55 Cal.4th at p. 246.)  But whether "shock the conscience" has a different meaning than "unreasonably one-sided" or should be the exclusive formulation of substantive unconscionability was not remotely at issue in *Pinnacle*, and "it is axiomatic that cases are not authority for propositions not considered." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.)  Likewise here, whether these different formulations actually constitute different standards in practice and whether one is more objective than the other are issues that have not been briefed and are not before us.  It is enough to observe that courts, including ours, have used various nonexclusive formulations to capture the notion that unconscionability requires a substantial degree of unfairness beyond "a simple old-fashioned bad bargain." (*Schnuerle*, *supra*, 376 S.W.3d at p. 575; see *ante*, at pp. 31, 36.)

**2.**

Next, Justice Chin argues what neither Sonic nor its amici curiae contend: that the Berman procedures do not actually benefit employees.  He claims that because the Labor Commissioner may exercise her discretion in deciding whether to conduct Berman hearings, any value of the Berman procedure to Moreno is "entirely speculative." (Conc. & dis. opn., *post*, at pp. 12, 14.)  Of course, no one can foresee with total certainty whether a particular employee's application for a Berman hearing will be granted, but that hardly means the Berman procedures have merely speculative value ex ante.  If the Berman procedures were, in practice, rarely used and generally unavailable to the employee, the significance of waiving such procedures would be diminished.  But the parties have not suggested, nor does the record before us indicate, that such is the case.

53

To the extent Justice Chin suggests that the Berman process is not well designed to facilitate prompt and enforceable resolution of wage claims, we have repeatedly concluded otherwise. In *Cuadra*, the court unanimously said: "The Berman hearing procedure is designed to provide a speedy, informal, and affordable method of resolving wage claims." (*Cuadra*, *supra*, 17 Cal.4th at p. 858.) In *Lolley*, the court unanimously said the fee-shifting provision in the Berman statutes "serves the legislative purpose of discouraging unmeritorious appeals of wage claims, thereby reducing the costs and delays of prolonged disputes." (*Lolley*, *supra*, 28 Cal.4th at p. 376.) And in *Sonic I*, the court said the benefits afforded to employees by the Berman statutes are "chiefly designed to reduce the costs and risks of pursuing a wage claim." (*Sonic I*, *supra*, 51 Cal.4th at p. 679.)

To the extent Justice Chin suggests that the Berman protections, despite their design, do not actually achieve their intended purpose, his contention is unsupported by the record before us. Although it may take several months or even a year to resolve a wage claim through the Berman process, the record contains no evidence, and the dissent cites none, that enables us to compare this timeframe with the time required to resolve a similar claim through arbitration of the sort contemplated in the agreement here. Such evidence, if any, may be considered on remand. In addition, Justice Chin notes our statement in *Gentry* that "Berman hearings may result in no cost savings to the employee" because of the possibility that "a losing employer has a right to a trial de novo in superior court." (*Gentry*, *supra*, 42 Cal.4th at p. 464.) But the court made that statement in the context of concluding that "Berman hearings are neither effective nor practical substitutes for class action or arbitration." (*Id.* at p. 465.) The fact that thousands of individual Berman hearings would not result in cost savings as compared to a single class proceeding (*id.* at p. 464) sheds no light on whether Berman hearings would result

54

in cost savings as compared to individual arbitrations of the same wage claims under the litigation-like rules set forth in the agreement in this case.

The rest of Justice Chin's dissent provides similarly scant support for its disparagement of the "asserted benefits of the Berman procedure" as "speculative." (Conc. & dis. opn., *post*, at p. 14.) Although the mandatory assessment of costs and attorney fees against the unsuccessful party in an appeal applies to the employee as well as the employer, the statute's asymmetric definition of success plainly works in the employee's favor. (§ 98.2, subd. (c) ["An employee is successful if the court awards an amount greater than zero."].) And even if the benefit of this provision was not available when Moreno signed his agreement in July 2002 — a fact relevant to the unconscionability analysis on remand — there is no question that the benefit has been available since July 2003 (Stats. 2003, ch. 93, § 2, p. 790) and helps to "reduc[e] the costs and delays of prolonged disputes" by deterring meritless appeals (*Lolley*, *supra*, 28 Cal.4th at p. 376). Further, although the Labor Commissioner has discretion to stay an award for good cause, it is unclear how this detracts from the Labor Commissioner's statutory duty to "make every reasonable effort to ensure that judgments are satisfied." (§ 98.2, subd. (i).) For an employee seeking to collect a judgment, it surely helps to have the Labor Commissioner on your side. Finally, with regard to the undertaking that an employer must post before taking an appeal (*id*., subd. (b)), the dissent notes that an employee who arbitrates a wage claim may obtain a provisional remedy requiring payment of wages during arbitration. (Conc. & dis. opn., *post*, at pp. 12–13.) But such a remedy is available only upon a showing that "the award to which the applicant may be entitled may be rendered ineffectual without provisional relief." (Code Civ. Proc., § 1281.8, subd. (b).)

In sum, the Berman procedures taken together are the Legislature's solution to the real-world problems employees face in recovering wages owed. The

55

Legislature has structured a set of informal procedures and incentives that make it more likely employees will be able to recover wages without incurring substantial attorney fees or the risk of liability for an employer's attorney fees. The Legislature has also enacted provisions to deter meritless appeals of wage claims through a trial de novo in superior court and to ensure that employees will be able to actually collect a favorable judgment. The dissent does not persuade us to second-guess the efficacy of this legislative solution or to depart from this court's consistent understanding of the Berman statutes' benefits. Because we see no basis to conclude that the benefits of the Berman procedures are "entirely speculative" (conc. & dis. opn., *post*, at pp. 12, 14) or that "arbitration *is* more streamlined than the Berman process" in this and every case (*id.* at p. 21), we decline to reject Moreno's claim of unconscionability on such grounds and instead direct the trial court on remand to consider Moreno's claim in light of any relevant evidence that the parties may submit.

**3.**

Justice Chin's other reasons for challenging our unconscionability analysis are likewise unpersuasive. He contends that our unconscionability rule is "hopelessly vague, uncertain, and subjective" because we do not define the terms "accessible," "affordable," "low-cost," "speedy," or "effective." (Conc. & dis. opn., *post*, at p. 10.) But the principles we set forth today are hardly anomalous insofar as they are not bright-line formulations. As this court long ago stated in determining "reasonable water use" in a water rights case: "There would seem to be no more difficulty in ascertaining what is a reasonable use of water than there is in determining probable cause, reasonable doubt, reasonable diligence, preponderance of evidence, a rate that is just and reasonable, public convenience and necessity, and numerous other problems which in their nature are not subject

56

to precise definition but which tribunals exercising judicial functions must determine." (*Gin S. Chow v. City of Santa Barbara* (1933) 217 Cal. 673, 706.) Many other examples abound. This court in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone* (1999) 20 Cal.4th 163, 187, in an opinion by Justice Chin, defined "unfair competition" for purposes of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) as conduct that "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws . . . , or otherwise significantly threatens or harms competition," while providing no definition or elaboration of the terms "threatens," "incipient," "policy," "spirit," or "significantly threatens or harms competition."

It has long been recognized that substantive unconscionability is not susceptible to "precise definition" (*A&M Produce*, *supra*, 135 Cal.App.3d at p. 487), and neither Civil Code section 1670.5 nor Uniform Commercial Code article 2-302 suggests otherwise. The fact that "affordable," "accessible," "effective," and similar terms are not subject to precise definition has not prevented common-law courts from applying these terms one case at a time to enforce the basic principle that the nondrafting party to an adhesive contract may not be subject to unconscionably one-sided terms. Indeed, the extant case law belies Justice Chin's concern that courts are simply unable to make reasonable determinations about whether an arbitration process is affordable. (See, e.g., *Gutierrez*, *supra*, 114 Cal.App.4th at pp. 90–91; *Patterson v. ITT Consumer Financial Corporation* (1993) 14 Cal.App.4th 1659, 1665–1666; *Alexander v. Anthony Intern, L.P.* (3d Cir. 2003) 341 F.3d 256, 269–270; *Brady v. Williams Capital Group, L.P.* (N.Y.App.Div. 2009) 64 A.D.3d 127, 135–136; *Murphy v. Mid-West Nat. Life Ins. Co. of Tennessee* (Idaho 2003) 78 P.3d 766, 768.) Despite the dire assertion that our approach to unconscionability is "hopelessly vague and unworkable" (conc. & dis. opn., *post*, at p. 17), we doubt the standards in our

57

opinion today will cause judges throughout the state to simply throw up their hands in despair.

Nor is our approach inconsistent with *Little*, in which we said that, "[w]ithout more," arbitration conducted with many of the formalities of litigation is not unconscionably one-sided. (*Little*, *supra*, 29 Cal.4th at p. 1075, fn. 1.) We reaffirm that such arbitration is not per se unconscionable or contrary to public policy, and as explained above, there are many ways to structure arbitration to facilitate accessible and affordable resolution of wage disputes. (See *ante*, at p. 35.) Our approach to unconscionability insists only that arbitration be so structured, and whether the arbitral process in this case, which includes the litigation-like formalities specified in the arbitration agreement, puts Moreno at such a disadvantage as to be unconscionable is a question to be determined on remand.

As noted, Sonic's counsel has represented that the arbitral process at issue here includes features not disclosed in the arbitration agreement, and the trial court may consider such features on remand. (See *ante*, at pp. 34–35.) Justice Chin says a court cannot perform this task because "arbitrators have broad discretion in determining the procedures and law governing the arbitration." (Conc. & dis. opn., *post*, at p. 11.) Again, his concern is unfounded. Although arbitrators have discretion to decide on features of arbitration that are not specified in the agreement, courts can and routinely do inquire into the rules that guide the conduct of arbitration in order to resolve unconscionability and related claims. (See, e.g., *Roman v. Superior Court* (2009) 172 Cal.App.4th 1462, 1475–1478 [examining American Arbitration Association's (AAA) rules to determine if arbitration agreement is contrary to public policy]; *D.C. v. Harvard-Westlake School* (2009) 176 Cal.App.4th 836, 863 [examining Judicial Arbitration and Mediation Services cost allocation rules to determine whether they adequately protect vindication of

58

statutory claim]; *Gutierrez, supra*, 114 Cal.App.4th at pp. 90–91 [examining AAA rules regarding arbitration costs to determine unconscionability]; *Popovich v. McDonald's Corp.* (N.D.Ill. 2002) 189 F.Supp.2d 772, 778 [concluding arbitration agreement unconscionable after examining the fees the employee would have to pay under the AAA commercial arbitration rules]); *Spinetti v. Serv. Corp. Int'l* (3d Cir. 2003) 324 F.3d 212, 217 [affirming district court ruling that fees were exorbitant under AAA rules in employment cases].) We see no reason why the trial court cannot do the same on remand.

Justice Chin further contends that our unconscionability inquiry is unworkable because "a determination of unconscionability must be based on the circumstances that existed 'at the time [the contract] was made' (Civ. Code, § 1670.5, subd. (a)), not on hindsight in light of subsequent events. [Citations.] Accordingly, . . . a trial court, in determining accessibility and affordability, will have to determine, not what Moreno can afford today, but what he could have afforded at the time he signed the arbitration agreement." (Conc. & dis. opn., *post*, at pp. 10–11.) This is not quite correct. Because a predispute arbitration agreement is an agreement to settle future disputes by arbitration, the proper inquiry is what dispute resolution mechanism the parties reasonably expected the employee to be able to afford. Absent unforeseeable (and thus not reasonably expected) circumstances, there is no reason to think that what an employee can afford when a wage dispute arises will materially differ from the parties' understanding of what the employee could afford at the time of entering the agreement. The dissent's concern that the affordability inquiry is "difficult, if not impossible" (*id.* at p. 10) is, once again, overblown. (See, e.g., *Gutierrez, supra*, 114 Cal.App.4th at pp. 90–91 [examining affordability of arbitration in the course of determining unconscionability "as of the time the contract is made"].)

59

Finally, Justice Chin quotes *Sonic I*'s statement that a trial court confronted with a petition to compel arbitration " 'is in no position to determine' 'whether and to what extent a particular wage claimant will benefit from the Berman hearing process.' " (Conc. & dis. opn., *post*, at p. 17, quoting *Sonic I*, *supra*, 51 Cal.4th at p. 683.) But this quotation, as the dissent presents it, is stripped of its essential context. In *Sonic I*, we rejected Sonic's argument that instead of imposing a categorical prohibition on Berman waivers, we should take a case-by-case approach, like the ad hoc approach to class action waivers we adopted in *Gentry*. (See *Gentry*, *supra*, 42 Cal.4th at pp. 462–464.) In finding *Gentry* "readily distinguishable," we observed that whereas a class action is "a judicially devised procedure" whose efficiencies and practicalities a trial court is " ' "ideally situated to evaluate," ' " a trial court "is in no position to determine" "whether and to what extent a particular wage claimant will benefit from the Berman hearing process." (*Sonic I*, at p. 683.) It is clear in context that we made this latter statement in support of the point that courts are in no position to second-guess, on an ad hoc basis, the Legislature's "judgment about the special protections and procedural rights that should be afforded to persons with wage claims in order to ensure that such claims be fairly resolved." (*Id.* at p. 683.) Indeed, in the paragraph right before the one in which the statement appears, we said: "The purpose of the Berman hearing statutes is to empower wage claimants by giving them access to a Berman hearing with all of its advantages." (*Id.* at p. 682.) Our point in *Sonic I* that courts are in no position to *disclaim* the benefits of the Berman procedures on a case-by-case basis does not remotely suggest that courts are in no position to *consider* such benefits in determining whether an arbitration agreement is unconscionable. If anything, the relevant passage in *Sonic I* points the other way. (*Id.* at pp. 682–683.)

60

## C.

In addition to the concerns discussed above, Justice Chin argues that our approach to unconscionability violates the FAA as interpreted in *Concepcion* and *Italian Colors*. Again, the dissent's contention does not withstand scrutiny.

## 1.

The dissent's fundamental error is its characterization of *Concepcion*'s holding in the following terms: "The FAA, as the high court has construed it, precludes state courts from finding an arbitration provision unconscionable based on the need to protect 'small-dollar claims that might otherwise slip through the legal system,' even though that goal may be 'desirable.' (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1753].) It 'trumps *any* interest in ensuring the prosecution of low-value claims' and 'favor[s] the absence of litigation when that is the consequence of' following its 'command' to enforce arbitration agreements 'according to their terms.' (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2312, fn. 5], italics added.)" (Conc. & dis. opn., *post*, at p. 20.) This is a misreading of *Concepcion* and, in turn, *Italian Colors*.

If the broad principle that arbitration agreements must be enforced according to their terms, notwithstanding the desirability of state laws protecting small-dollar claims, were the decisive principle in *Concepcion*, then why would the high court have bothered to spill so much ink explaining why class proceedings are incompatible with "fundamental attributes of arbitration"? (*Concepcion*, *supra*, 563 U.S. at pp. __–__ [131 S.Ct. at pp. 1748–1753].) That entire discussion would have been unnecessary on Justice Chin's account of *Concepcion*. The holding of *Concepcion* is that "[r]equiring the availability of classwide arbitration *interferes with fundamental attributes of arbitration* and *thus* creates a scheme inconsistent with the FAA." (*Id.* at p. 1748, italics added.) *Italian Colors*, another case involving a class waiver, restated *Concepcion*'s

61

holding in exactly the same terms: "There [in *Concepcion*] we invalidated a law conditioning enforcement of arbitration on the availability of class procedure *because that law 'interfere[d] with fundamental attributes of arbitration.'* 563 U.S. at —, 131 S.Ct., at 1748." (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2312], italics added.) When footnote 5 of *Italian Colors* is read together with the paragraph in the main text that precedes it, the high court's statement that *Concepcion* established that "the FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims" means that no such interest can save a state law from FAA preemption where "that law 'interfere[s] with fundamental attributes of arbitration.' " (*Italian Colors*, at p. __ & fn. 5 [133 S.Ct. at p. 2312 & fn. 5]; see *ante*, at pp. 47–48.)

Thus, *Concepcion* expressly states, and *Italian Colors* expressly confirms, that the dispositive rationale for *Concepcion*'s preemption holding is that class proceedings interfere with "fundamental attributes of arbitration." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1748]; see *Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2312].) Remarkably, however, Justice Chin never mentions the high court's sustained focus on "fundamental attributes of arbitration" in his rendition of *Concepcion*'s reasoning and result, and even affirmatively disclaims the relevance of such fundamental attributes in characterizing the principle established by *Concepcion*. (Conc. & dis. opn., *post*, at pp. 18–21, 23–24.)

Justice Chin does claim that "arbitration *is* more streamlined than the Berman process" and that our approach to unconscionability "is likely to produce procedures that are *less* efficient, *more* costly, *more* formal, and *more* time consuming than arbitration." (Conc. & dis. opn., *post*, at p. 21.) But, as explained above, these bare assertions have no evidentiary support, and this court's settled

understanding that the Berman process provides a speedy, informal, and low-cost method of resolving wage disputes (see *ante*, at pp. 9–10, 37, 53–56) cannot be dislodged by the dissent's mere disbelief. Although the dissent says "the majority never factors in the trial-de-novo option under the Berman statutes" (conc. & dis. opn., *post*, at p. 21), it is the dissent that ignores what we have repeatedly said here (see *ante*, at pp. 8, 9, 54, 55, 56) and elsewhere (see *Lolley*, *supra*, 28 Cal.4th at p. 376; *Sonic I*, *supra*, 51 Cal.4th at p. 674) about the considerable incentives built into the Berman process to discourage de novo appeals in superior court and thereby promote speed, efficiency, affordability, and informality in dispute resolution. Indeed, it is hardly "self-evident" that the option to appeal necessarily means the Berman process "is not speedier or more streamlined than arbitration" (conc. & dis. opn., *post*, at p. 13), for surely it matters how often the option is actually used. Moreover, as noted, our approach to unconscionability does not erect a " 'preliminary litigating hurdle' " of the sort prohibited by *Italian Colors*. (*Ante*, at pp. 48–49.) The FAA's saving clause contemplates initial resolution of unconscionability claims, and despite Justice Chin's determined effort to portray the inquiry as exceedingly complex (see conc. & dis. opn., *post*, at pp. 22–23), we do not share his lack of confidence in the ability of our trial courts to swiftly examine relevant evidence and resolve such claims.

Instead of coming to grips with *Concepcion*'s core rationale, Justice Chin's dissent assigns decisive weight to the general proposition that the FAA's principal purpose is to ensure enforcement of arbitration agreements " 'according to their terms.' " (Conc. & dis. opn., *post*, at pp. 19, 20, 21, 24, 27.) To be sure, this proposition is well established in the high court's FAA precedents. (See, e.g., *Italian Colors*, *supra*, 570 U.S. at p. __, fn. 5 [133 S.Ct. at p. 2312, fn. 5]; *Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1748].) But the dissent attributes to the FAA a purpose to "pursue that broadest goal only at the expense

63

of harming other values that the legislature deems important.  After all, no statute . . . pursues its 'broad purpose' at all costs." (Scalia & Garner, Reading Law: The Interpretation of Legal Texts (2012) p. 21, citing *Pension Benefit Guarantee Corp. v. LTV Corp.* (1990) 496 U.S. 633, 647 [" '[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.'  [Citation.]"].)  The FAA itself makes explicit the other values at play.  The statute's saving clause says an arbitration agreement may be held unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract" (9 U.S.C. § 2), and the high court in *Concepcion*, after quoting this saving clause, recognized that the FAA "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or *unconscionability*.' " (*Concepcion*, at p. __ [131 S.Ct. at p. 1746], italics added.)  In reconciling the FAA's purpose of enforcing arbitration agreements with the FAA's preservation of an unconscionability defense, *Concepcion* plainly did not hold that the FAA preempts all unconscionability rules; it held that the FAA preempts unconscionability rules that interfere with fundamental attributes of arbitration.  By contrast, it is not clear what meaning, if any, Justice Chin would assign to the FAA's saving clause.  His theory that the FAA preempts any unconscionability rule that interferes with enforcement of arbitration agreements according to their terms would authorize even blatant forms of unconscionability, such as an adhesive agreement that gives the drafting party the sole power to choose the arbitrator (*Scissor-Tail*, *supra*, 28 Cal.3d at p. 828) or imposes a one-sided provision for appealing an arbitral award (*Little*, *supra*, 29 Cal.4th at pp. 1071–1074).  (Compare *ante*, at pp. 29–30 with conc. & dis. opn., *post*, at p. 26, fn. 7.)

Under the dissent's sweeping view of FAA preemption, no unconscionability rule may take into account the surrender of statutory protections

64

for certain claimants, whether or not those protections interfere with fundamental attributes of arbitration. Waiver of fee-shifting provisions favoring particular litigants (see *Serpa*, *supra*, 215 Cal.App.4th at pp. 709–710 [discussing fee-shifting under FEHA]; *Ajamian*, *supra*, 203 Cal.App.4th at p. 800 [discussing § 1194]) or statutory protections for small-dollar claims modeled on the very arbitration agreement that the high court discussed approvingly in *Concepcion* (see *ante*, at p. 39) must apparently count for nothing in a court's assessment of unconscionability. It is this approach, not ours, that "appears to go far beyond" the high court's pronouncements on FAA preemption. (Conc. & dis. opn., *post*, at p. 20.) For the high court has never suggested that unconscionability doctrine must disavow *any* concerns about cost or other features of arbitration that prevent effective resolution of arbitral disputes.

In *Concepcion* and in *Italian Colors*, the high court rejected a challenge to an arbitration agreement where the only asserted defect was the absence of class proceedings and where the only remedy — to allow class proceedings — was deemed incompatible with fundamental attributes of arbitration. Unlike *Discover Bank*'s rule entitling consumers to class proceedings, and unlike *Sonic I*'s rule entitling wage claimants to pursue a Berman hearing, the unconscionability rule we articulate today requires no such incompatible proceedings. Our rule fully recognizes that parties may opt out of the Berman process with any agreement that provides for accessible, affordable arbitration of wage disputes. Contrary to the dissent's characterization, our unconscionability rule does not "impose all sorts of arbitration procedures" (conc. & dis. opn., *post*, at p. 23); instead, it targets practical impediments to the use of arbitration to resolve wage disputes while imposing no specific procedural requirements. Our rule thus serves to *facilitate access to arbitration* without compromising any of its fundamental attributes. How such a rule " 'stands as an obstacle to the accomplishment and execution of

the full purposes and objectives of [the FAA]' " (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1753]) is difficult to fathom. Indeed, the very notion that an arbitration agreement might *increase* the cost and complexity of dispute resolution would have been foreign to the Congress that enacted the FAA. (See Joint Hearings on Sen. No. 1005 and H.R. No. 646 before Subcoms. of Coms. on Judiciary, 68th Cong., 1st Sess., § 15, at pp. 34–35 (1924) [advocating arbitration as a means of lowering the cost of dispute resolution]; Sen.Rep. No. 536, 68th Cong., 1st Sess., § 2, at p. 3 (1924) [same].)

**2.**

Justice Chin also asserts, using various formulations, that our approach to unconscionability discriminates against arbitration. (Conc. & dis. opn., *post*, at p. 26 [" 'construe[s] [an arbitration] agreement in a manner different from that in which [a court] otherwise construes nonarbitration agreements under state law' "]; *ibid.* ["crafts different unconscionability rules for arbitration agreements"]; *id.* at p. 28 [" 'disfavors arbitration' " and " 'derive[s] [its] meaning from the fact that an agreement to arbitrate is at issue' "].) The main problem, the dissent says, is that our unconscionability rule is "not a ground that exists at law or in equity for the revocation of *any* contract, but is . . . merely a ground that exists for the revocation of arbitration provisions in contracts subject to the Berman statutes or to other statutes that 'legislatively' afford to 'a particular class . . . specific protections in order to mitigate the risks and costs of pursuing certain types of claims.' " (*Id.* at p. 25.)

Again, the reasoning of *Concepcion* is instructive. In calling into question unconscionability rules that "would have a disproportionate impact on arbitration agreements" (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1747]), the high court was careful not to suggest that the FAA preempts *any* such rule. Instead, the high court marshaled a series of examples to show that

66

unconscionability rules nominally applicable to both arbitration and nonarbitration agreements may, in practice, be " 'aimed at destroying arbitration' " or " 'demand[] procedures incompatible with arbitration.' " (*Concepcion*, at p. __ [131 S.Ct. at p. 1747]; see *ibid.* [positing unconscionability rules that require judicially monitored discovery, adherence to the Federal Rules of Evidence, or ultimate disposition by a jury].) In those circumstances, the rule is preempted by the FAA. But we have long recognized that the mere fact that general unconscionability principles are applied to the specific context of arbitration does not mean that the rule is preempted by the FAA. (See *Armendariz*, *supra*, 24 Cal.4th at p. 119.) The crucial issue is whether the rule undermines the procedural essence of arbitration in some way — that is, whether the rule "interferes with fundamental attributes of arbitration." (*Concepcion*, at p. __ [131 S.Ct. at p. 1748].) Where, as here, an unconscionability rule that is equally applicable to arbitration and nonarbitration agreements does not interfere with fundamental attributes of arbitration, the rule cannot be said to discriminate against arbitration simply because it applies more often to arbitration agreements.

Neither *Perry v. Thomas* (1987) 482 U.S. 483 (*Perry*) nor *Southland Corp. v. Keating* (1984) 465 U.S. 1 (*Southland*) suggests otherwise. *Perry* held that the FAA preempted a state statute providing that "actions for the collection of wages may be maintained 'without regard to the existence of any private agreement to arbitrate.' [Citation.]" (*Perry*, at p. 484.) Similarly, *Southland* held that the FAA preempted a decision of this court that had read into the California Franchise Investment Law a "defense to arbitration" that "require[d] judicial consideration of claims brought under [that] state statute." (*Southland*, at pp. 10, 16, fn. 11.) In *Perry*, the high court explained in a footnote that unconscionability doctrine could not be used to avoid the preemptive rule: "[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the

validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of [the FAA's saving clause]. [Citation.] A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what we hold today the state legislature cannot." (*Perry*, at pp. 492–493, fn. 9.)

Under *Perry* and *Southland*, the FAA clearly preempts a state unconscionability rule that establishes an unwaivable right to litigate particular claims by categorically deeming agreements to arbitrate such claims unenforceable. That is what the high court meant by its reference to "[a] state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue." (*Perry*, *supra*, 482 U.S. at p. 492, fn. 9.) The unconscionability rule we set forth today is not at all similar to the preempted state laws in *Perry* and *Southland* or their functional equivalents in unconscionability doctrine. Whereas the state-law rules in those cases overtly discriminated against arbitration in favor of litigation of certain claims, thereby rendering contracts to arbitrate such claims entirely enforceable, our unconscionability rule fully contemplates the enforceability of agreements to resolve wage disputes through arbitration in lieu of the Berman process. Our rule requires only that wage claimants have an accessible and affordable mechanism for dispute resolution, not that the mechanism adopt any particular procedure or assume any particular form. Moreover, the principles informing our rule plainly "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally"

68

(*Perry*, at p. 492, fn. 9), for the doctrine that courts will not enforce adhesive contracts or terms that are unreasonably one-sided in favor of the drafting party, such as terms that effectively insulate the drafting party from liability, is a body of state law that long predates and subsumes its more recent extension to arbitration agreements. (See *Stevens*, *supra*, 58 Cal.2d at pp. 879–882 [collecting cases].)

Justice Chin's dissent concludes with the ominous implication that the unconscionability rule we adopt today demonstrates " 'judicial hostility' " toward arbitration agreements. (Conc. & dis. opn., *post*, at p. 28.) But we are well past the day when prevailing judicial sensibilities regarded reasonable state regulation of the employment relationship as an expression of hostility to contractual freedom. Our unconscionability rule does not treat arbitration agreements differently from nonarbitration agreements, does not remotely foreclose the enforceability of agreements to arbitrate wage disputes, and does not require such agreements to adopt any devices or procedures inimical to arbitration's fundamental attributes. "It should be stressed," as Justice Corrigan observes, "that our decision today does not require trial courts to adopt a new procedure or analytical approach when an unconscionability defense concerns an arbitration provision in an employment contract." (Conc. opn., *post*, at p. 2.) In short, our rule does not discriminate against arbitration. The FAA requires courts to place arbitration agreements on equal footing with other contracts. At the same time, the FAA makes clear that the legal footing on which arbitration and nonarbitration agreements may be placed encompasses any "grounds as exist at law or in equity for the revocation of any contract" (9 U.SC. § 2), including " 'generally applicable contract defenses, such as fraud, duress, or unconscionability' " (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1746]). Our opinion today is fully consistent with this governing law.

69

## CONCLUSION

The trial court denied the petition to compel arbitration as premature, ruling that arbitration may not be ordered until completion of a Berman hearing. (*Sonic I*, *supra*, 51 Cal.4th at p. 671.) Although we affirmed that order in *Sonic I*, we now hold, in light of *Concepcion*, that the FAA preempts a state-law rule that categorically prohibits an adhesive arbitration agreement from requiring an employee to waive access to a Berman hearing. A court faced with a petition to compel arbitration under these circumstances must grant the petition unless the party opposing the petition asserts a valid contract defense. Moreno has asserted an unconscionability defense, whose merits should now be determined by the trial court in the first instance in light of our decision today. Accordingly, we reverse the judgment of the Court of Appeal granting the petition to compel arbitration and remand with directions to remand the case to the trial court for proceedings consistent with this opinion.

LIU, J.


WE CONCUR:   CANTIL-SAKAUYE, C. J.
                             KENNARD, J.
                             WERDEGAR, J.
                             CORRIGAN, J.

## CONCURRING OPINION BY CORRIGAN, J.

I concur in the result and much of the analysis in the majority opinion, but I disagree with its failure to articulate a clear standard for assessing the unconscionability of arbitration terms in employment agreements.

The majority refers to several formulations but does not settle on a test for unconscionability.  It describes an analysis in which the trial court weighs the Berman advantages waived against the benefits of arbitration to decide if the agreement is "unreasonably one-sided."  (Maj. opn., *ante*, at pp. 33, 49.)  Justice Chin characterizes this approach as interest weighing and criticizes it as insufficiently deferential to arbitration.  Whereas the majority would remand for the trial court to determine unconscionability, Justice Chin would have us decide here that the agreement is not unconscionable.

I agree with Justice Chin that the proper test for determining unconscionability here is whether the terms are " 'so one-sided as to "shock the conscience." ' "  (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246.)  Courts are not free to alter terms to which the contracting parties agreed simply because they find the terms unreasonable or ill-advised.  (*American Software, Inc. v. Ali* (1996) 46 Cal.App.4th 1386, 1391.)  The unconscionability defense requires a much stronger showing of unfairness.  The majority opinion mentions the "shock the conscience" standard, but only as one of several formulations.  (See maj. opn., *ante*, at p. 31.)  In my view, we should provide clarity here.  Courts of Appeal have successfully applied the "shock the conscience" standard to decide whether contractual employment

arbitration terms are substantively unconscionable. (See, e.g., *Peng v. First Republic Bank* (Aug. 29, 2013, A135503) __ Cal.App.4th __ [2013 Cal. App. Lexis 772, at pp. *18-*22]; *Serpa v. California Surety Investigations, Inc.* (2013) 215 Cal.App.4th 695, 703, 710.) We should settle on this clear test. Under the "shock the conscience" standard, arbitration provisions are not unconscionable simply because their enforcement will require the employee to forego Berman procedures.

However, unconscionability is a fact-specific defense. Appellate courts are at a disadvantage when the question is not fleshed out in the trial court. Thus, I agree with the majority that this case should be remanded for the trial court to decide the merits of the unconscionability defense. The majority opinion discusses many considerations to guide the lower court's analysis. Justice Chin criticizes several of these and faults the majority for requiring "a mini-trial on the comparative costs and benefits of arbitration and the Berman procedure" in every case. (Conc. & dis. opn. of Chin, J., *post*, at p. 22.)

It should be stressed that our decision today does not require trial courts to adopt a new procedure or analytical approach when an unconscionability defense concerns an arbitration provision in an employment contract. Considerations outlined in the majority opinion may be *relevant* to such an analysis, but lower courts retain discretion to weigh these considerations as appropriate in each particular case. Today's decision holds only that unconscionability remains a defense to enforcement of an arbitration clause in an employment contract and that, while the relinquishment of Berman procedures is one factor to be weighed in considering unconscionability, this factor alone is *not sufficient* to support an unconscionability finding.

With this understanding, I join the majority's decision.

**CORRIGAN, J.**

**CONCURRING AND DISSENTING OPINION BY CHIN, J.**

In *Sonic-Calabasas A, Inc. v. Moreno* (2011) 51 Cal.4th 659, 669 (*Sonic I*), a bare four-to-three majority of this court held that the arbitration provision here at issue is both contrary to our state's public policy and unconscionable — and therefore unenforceable — to the extent it precludes Frank Moreno from pursuing an administrative hearing — known as a "Berman hearing" — before submitting his claim for vacation pay to arbitration. I agree with the majority's conclusion that the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) preempts *Sonic I*'s public policy rationale. However, I disagree with the majority's decision to remand this case on the issue of unconscionability. As I explain below, we should reject Moreno's unconscionability claim for two reasons: (1) he forfeited it by failing to raise and pursue it below; and (2) he has not met, and cannot meet, his burden of showing unconscionability. I also disagree with the majority's advisory opinion regarding the unconscionability principles the trial court should apply on remand. In my view, those principles are both contrary to state law and invalid under — and thus preempted by — the FAA. I dissent from this aspect of the majority's opinion and from the judgment.

## I.   Factual Background.

Frank Moreno was an employee of Sonic-Calabasas A, Inc. (Sonic). In December 2006, after voluntarily ending his employment, he filed a wage claim

with the Labor Commissioner pursuant to Labor Code section 98 et seq.[1] seeking allegedly unpaid "vacation wages" for 63 days at the rate of $441.29 per day, for a total of $18,203.54. He also requested "additional wages accrued pursuant to Labor Code Section 203 as a penalty."

In February 2007, Sonic filed in the superior court a petition to compel arbitration of Moreno's claim and to dismiss his pending administrative action. It relied on the broad and comprehensive arbitration provision in an agreement Moreno signed on July 14, 2002, which provides in relevant part: "I . . . acknowledge that [Sonic] utilizes a system of alternative dispute resolution that involves binding arbitration to resolve all disputes that may arise out of the employment context. Because of the mutual benefits (such as reduced expense and increased efficiency) which private binding arbitration can provide both [Sonic] and myself, both [Sonic] and I agree that any claim, dispute, and/or controversy (including, but not limited to, any claims of discrimination and harassment . . .) that either I or [Sonic] . . . may have against the other which would otherwise require or allow resort to any court or other governmental dispute resolution forum arising from, related to, or having any relationship or connection whatsoever with my seeking employment with, employment by, or other association with [Sonic], whether based on tort, contract, statutory, or equitable law, or otherwise, (with the sole exception of claims arising under the National Labor Relations Act . . . , claims for medical and disability benefits under the California Workers Compensation Act, and Employment Development Department claims) shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act, in conformity with the procedures of the California Arbitration Act (Cal. Code Civ. Proc. sec. 1280 et seq., including

---

[1] All further unlabeled statutory references are to the Labor Code.

section 1283.05 and all of the Act's other mandatory and permissive rights to discovery).  However, nothing herein shall prevent me from filing and pursuing administrative proceedings only before the California Department of Fair Employment and Housing, or the U.S. Equal Opportunity Commission."

Moreno and the Labor Commissioner, who intervened on Moreno's behalf, opposed Sonic's motion to compel.  They argued that, insofar as the arbitration agreement deprives Moreno of the benefits of the Berman procedure, it is unenforceable as against public policy.

The superior court denied the petition to compel arbitration, agreeing that the arbitration provision violates public policy insofar as it waives Moreno's right to pursue a Berman hearing.  The Court of Appeal reversed, finding "no evidence" in the record "that Moreno or any other wage claimant lacks the knowledge, skills, abilities, or resources to vindicate his or her statutory rights in an arbitral forum."

As noted above, in *Sonic I*, a narrow majority of this court held that the arbitration provision is both contrary to our state's public policy and unconscionable — and therefore unenforceable — to the extent it precludes Moreno from pursuing a Berman hearing before submitting his claim for vacation pay to arbitration.  (*Sonic I*, *supra*, 51 Cal.4th at p. 669.)  The United States Supreme Court granted certiorari, vacated the judgment, and remanded the case to us for consideration in light of *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. __ [131 S.Ct. 1740] (*Concepcion*).

## II.   The FAA Preempts *Sonic I*'s Public Policy Rationale.

In my dissent in *Sonic I*, I explained that the FAA, under the United States Supreme Court's binding interpretation of that statute, preempts the *Sonic I* majority's public policy rationale.  (*Sonic I*, *supra*, 51 Cal.4th at pp. 706-712 (dis. opn. of Chin, J.).)  After we decided *Sonic I*, the high court held in *Concepcion*

3

that the FAA preempts the California rule, announced by another four-to-three majority of this court in *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148 (*Discover Bank*), that certain waivers of classwide arbitration procedures are unconscionable and unenforceable. (*Concepcion*, *supra*, 563 U.S. at pp. ___ [131 S.Ct. at pp. 1747-1748].) *Concepcion* confirms my discussion in *Sonic I*. I therefore agree with the majority that the FAA preempts *Sonic I*'s public policy rationale.

### III. Moreno Has Forfeited His Unconscionability Claim.

As the majority acknowledges (maj. opn., ante, at p. 38), because unconscionability is a contract defense, the party resisting enforcement of an arbitration provision has the burden of proving unconscionability. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development* (US), LLC (2012) 55 Cal.4th 223, 236 (*Pinnacle*).) In light of this principle, both this court and our Courts of Appeal have held that a party resisting arbitration forfeits the defense of unconscionability by failing to pursue it in the trial court. (*Pearson Dental Supplies, Inc. v. Superior Court* (2010) 48 Cal.4th 665, 681; *Mastick v. TD Ameritrade, Inc.* (2012) 209 Cal.App.4th 1258, 1266-1267.)

The record here supports application of this forfeiture rule to Moreno's unconscionability claim. At no point in the trial court did Moreno claim that the arbitration provision here is "unreasonably one-sided in favor of the employer." (Maj. opn., *ante*, at p. 2.) He did allege in his response to Sonic's petition to compel that the arbitration provision is unconscionable because it "fails to provide an arbitral forum in which employees can fully and effectively vindicate their statutory rights to recover unpaid wages." However, he did nothing further in the trial court to pursue either this or any other unconscionability defense. In his briefs, he did not, as the majority asserts, argue that the Berman waiver "was per

4

se unconscionable." (Maj. opn., *ante*, at p. 50.)  Rather, he argued only that the arbitration provision violates public policy.  Nor did he assert unconscionability in the Court of Appeal, in the petition for review he filed in this court, or in the opening and reply briefs he filed with us.  In fact, Moreno never mentioned unconscionability again until well after briefing closed in this court, when we resurrected the issue by asking the parties to discuss it in supplemental briefs.  On this record, Moreno has forfeited the claim that the arbitration provision is unconscionable.  The majority fails to explain why it does not apply the forfeiture rule and why it is giving Moreno a second chance "to develop" a defense that, as the majority acknowledges, he "chose" to abandon below as a matter of litigation strategy.  (Maj. opn., *ante*, at p. 50.)

**IV.  Under Existing California Law, the Arbitration Provision Is Not Unconscionable.**

Were it either necessary or appropriate to reach the unconscionability claim Moreno is now asserting, under existing California law, I would reject it.

Civil Code section 1670.5, subdivision (a), authorizes a court, upon finding "as a matter of law" that a "contract or any clause of the contract" was "unconscionable at the time it was made," to "refuse to enforce the contract," to "enforce the remainder of the contract without the unconscionable clause," or to "so limit the application of any unconscionable clause as to avoid any unconscionable result."  The official Assembly comment accompanying this section explains:  "The basic test [of unconscionability] is whether, in light of the general background and the needs of the particular case, the clauses involved are so one-sided as to be unconscionable under the circumstances at the time of the making of the contract. . . . The principle is one of prevention of oppression and unfair surprise [citation] and not of disturbance of allocation of risks because of superior bargaining power."  (Rep. on Assem. Bill No. 510 (1979-1980 Reg.

5

Sess.) 5 Assem. J. (1979-1980 Reg. Sess.) p. 9231, reprinted as Legis. Com. com., 9 West's Ann. Civ. Code (2011 ed.) p. 74 (Official Comment).)  Consistent with this comment, we recently reaffirmed in the context of determining the validity of an arbitration provision that "[a] contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be 'so one-sided as to "shock the conscience." '  [Citation.]" (*Pinnacle*, *supra*, 55 Cal.4th at p. 246.)

Under these principles, the arbitration provision at issue here is not unconscionable.  As the majority notes, in evaluating a claim that a contract is unconscionable, we look to the parties' "overall" agreement, not to a single aspect of the agreement in isolation.  (Maj. opn., *ante*, at p. 49.)  The agreement at issue here is not simply a Berman waiver, and does not target the Berman procedure.  Rather, it is a broad, *bilateral* arbitration provision that applies, with certain exceptions, to "all disputes" between the parties "aris[ing] out of the employment context that either [party] . . . may have against the other."  As Sonic observes, this provision "does not inequitably exempt the employer from arbitration of claims more likely to be brought by an employee."  On the contrary, to the extent the provision lacks mutuality, it favors *Moreno*, by excluding claims that are generally brought by employees.  That Moreno's wage claim is not one of those excluded claims does not render the arbitration provision as a whole one-sided in Sonic's favor, let alone " 'so one-sided as to "shock the conscience." '  [Citation.]" (*Pinnacle*, *supra*, 55 Cal.4th at p. 246.)

Supporting my conclusion is this court's decision in *Little v. Auto Steigler, Inc.* (2003) 29 Cal.4th 1064.  There, a terminated employee sued his former employer for tortious demotion and termination in violation of public policy, breach of an implied contract of continued employment, and breach of the implied covenant of good faith and fair dealing.  (*Id.* at p. 1069.)  The employer moved to

compel arbitration under a provision that, like the one now at issue, specified that the arbitrator must be a retired California superior court judge and made applicable the ordinary civil rules of pleading, rules of evidence, and resolution of disputes by motions.  (*Id.* at pp. 1069-1070.)  The majority rejected the argument that "incorporation of [these] legal formalities into" the arbitration procedure rendered the arbitration agreement "unconscionable," explaining:  "Without more, . . . we cannot say that these provisions, which make arbitration more closely follow judicial procedures, are unconscionably one-sided.  It is not at all obvious that such provisions would inordinately benefit [the employer] rather than [the employee]."  (*Little*, *supra*, 29 Cal.4th at p. 1075, fn. 1.)  A similar conclusion is appropriate here.

### V.  The Majority's Test for Unconscionability is Vague, Unworkable, and Inconsistent with Existing California Law.

The majority believes that Moreno, who made no attempt in the trial court to show unconscionability, should nevertheless have a second chance.  After concluding that, under the FAA, "unconscionability remains a valid defense to a petition to compel arbitration" (maj. opn., *ante*, at p. 28), the majority reasons that, because Moreno did not "develop[]" his unconscionability claim below (maj. opn., *ante*, at p. 3), remand is appropriate so the trial court can consider that claim "in the first instance" (maj. opn., *ante*, at p. 50).  Because this conclusion "is decisive of the appeal" (*Stockton Theatres, Inc. v. Palermo* (1956) 47 Cal.2d 469, 474), the majority's lengthy discussion of various principles and factors it believes should "properly inform" the trial court's "unconscionability inquiry" (maj. opn., *ante*, at p. 38), which the majority offers "to guide the parties and the trial court on remand" (*id.* at p. 51), is "obiter dictum" and is not "the law of the case" (*Stockton Theatres, Inc. v. Palermo*, *supra*, at p. 474).

7

Moreover, there are numerous problems with the majority's dicta, starting with its articulation of the general unconscionability standard.  According to the majority, the trial court may declare the arbitration provision unconscionable upon finding that it is "unreasonably" one-sided in favor of the employer.  (Maj. opn., *ante*, at p. 2.)  If, by this, the majority means " 'so one-sided as to "shock the conscience" ' " (*Pinnacle*, *supra*, 55 Cal.4th at p. 246), then, as discussed above, I agree.  And, as explained above, the arbitration agreement is not so one-sided as to shock the conscience simply because it fails to exclude wage claims from the otherwise broad agreement to arbitrate *all* claims either party may have against the other.

However, if, by "unreasonably one-sided," the majority means something less, then I disagree.  As our Courts of Appeal have consistently recognized, the phrase "shock the conscience" is not, as the majority suggests (maj. opn., *ante*, at p. 33), "synonymous with 'unreasonable.'  Basing an unconscionability determination on the reasonableness of a contract provision would inject an inappropriate level of judicial subjectivity into the analysis.  'With a concept as nebulous as "unconscionability" it is important that courts not be thrust in the paternalistic role of intervening to change contractual terms that the parties have agreed to merely because the court believes the terms are unreasonable.  The terms must shock the conscience.'  [Citation.]"  (*Morris v. Redwood Empire Bancorp.* (2005) 128 Cal.App.4th 1305, 1322-1323, quoting *American Software, Inc. v. Ali* (1996) 46 Cal.App.4th 1386, 1391; see also *Walnut Producers of California v. Diamond Foods, Inc.* (2010) 187 Cal.App.4th 634, 647-648; *Belton v. Comcast* (2007) 151 Cal.App.4th 1224, 1247; *Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 809; *Wayne v. Staples* (2006) 135 Cal.App.4th 466, 483; *Koehl v. Verio, Inc.* (2006) 142 Cal.App.4th 1313, 1340; *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 214-215.)

Unfortunately, it appears the majority does, in fact, mean something less. Early in its opinion, the majority indicates that whether the arbitration provision is unconscionable turns on "the fundamental fairness of the bargain," which "depend[s] on what benefits the employee may have received under the agreement's substantive terms and the totality of the circumstances surrounding the formation of the agreement." (Maj. opn., *ante*, at pp. 2-3.) Later, the majority indicates that the key question is whether the agreement is "unreasonably favorable to one party." (Maj. opn., *ante*, at p. 37.) These formulations seem tantamount to asking whether the arbitration provision was a bad bargain, and thus are inconsistent with our statement in *Pinnacle* that a contract term is not substantively unconscionable merely because it "gives one side a greater benefit." (*Pinnacle*, *supra*, 55 Cal.4th at p. 246.) They are also inconsistent with the Legislature's intent in enacting the unconscionability statute, Civil Code section 1670.5, subdivision (a), which was to prevent oppression and unfair surprise, "not [to] disturb[] [the] allocation of risks because of superior bargaining power." (Off. Com., 9 West's Ann. Civ. Code, *supra*, foll. § 1670.5, p. 74.) And, they endorse the subjective "unreasonableness" standard that, as explained above, California courts have consistently rejected.

In the end, the majority, though purporting to provide guidance to the trial court, refuses to say precisely what standard the court should apply on remand in determining unconscionability. Instead, after asserting that our case law "does not indicate" whether the shock the conscience standard is "different" from the many other standards the majority puts forth, or "is the one true, authoritative standard for substantive unconscionability, exclusive of all others" (maj. opn., *ante*, at p. 51), the majority declines to decide these questions and leaves it to the trial court to determine which of the majority's "nonexclusive formulations" to apply (maj. opn., *ante*, at p. 53). In my view, *Pinnacle* settles the question; the arbitration

9

provision at issue is unconscionable only if it is so one-sided as to shock the conscience.  (*Pinnacle*, *supra*, 55 Cal.4th at p. 246.)

The majority's dicta regarding how the general unconscionability standard should be applied in this specific case is also problematic.  The majority offers a number of different formulations, indicating that the arbitration agreement's validity turns, variously, on whether the arbitration procedure (1) will enable Moreno to "vindicate his right to recover unpaid wages" (maj. opn., *ante*, at p. 29) or "obtain prompt, affordable, and enforceable resolution of [his] wage claim" (maj. opn., *ante*, at p. 35); (2) will "impose[] costs and risks . . . that make the resolution of the wage dispute inaccessible and unaffordable, and thereby 'effectively blocks every forum for redress' " (*ibid*.); and (3) will provide "an effective and low-cost approach to resolving wage disputes" (*ibid*.), a "speedy, informal, and affordable resolution" of Moreno's wage claim (maj. opn., *ante*, at p. 38), or an "accessible" and "affordable" forum for resolving his wage dispute (maj. opn., *ante*, at pp. 34, 36, 39).  These terms are hopelessly vague, uncertain, and subjective.  The majority offers no clue as to what it means to be "accessible," "affordable," "low-cost," "speedy," or "effective," and concedes that these terms "are not subject to precise definition."  (Maj. opn., *ante*, at p. 57.)  Nor does the majority specify whether the arbitration procedure is to be judged on these measures in the abstract, relative to litigation, or relative to the Berman procedure.

Even were these terms capable of precise definition, the inquiry necessary to apply them would be difficult, if not impossible.  Under our law, a determination of unconscionability must be based on the circumstances that existed "at the time [the contract] was made" (Civ. Code, § 1670.5, subd. (a)), not on hindsight in light of subsequent events.  (*Setzer v. Robinson* (1962) 57 Cal.2d 213, 217; *Colton v. Stanford* (1890) 82 Cal. 351, 403.)  Accordingly, under the majority's approach, a trial court, in determining accessibility and affordability,

10

will have to determine, not what Moreno can afford today, but what he could have afforded at the time he signed the arbitration agreement. (*Parada v. Superior Court* (2009) 176 Cal.App.4th 1554, 1583 (*Parada*).)[2] It will also have to determine, not how an arbitration would be conducted today, but how it would have been conducted at the time the parties signed the arbitration agreement. (*O'Hare v. Municipal Resource Consultants* (2009) 107 Cal.App.4th 267, 281-282.) Moreover, whether the inquiry looks to the present or to the future, a court simply cannot perform the task the majority assigns it: determining "the particulars" of Sonic's arbitration process that the agreement does not "reveal." (Maj. opn., *ante*, at p. 34.) The particulars of an arbitration process that are not specified in the arbitration agreement or the applicable arbitration rules are *for the arbitrator*, not the court, to decide (*Howsam v. Dean Witter Reynolds, Inc.* (2002) 537 U.S. 79, 84 [procedural questions are for the arbitrator]), and arbitrators have broad discretion in determining the procedures and law governing the arbitration, including their contractual authority to fashion remedies (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376; *Sanchez v. Western Pizza Enterprises, Inc.* (2009) 172 Cal.App.4th 154, 177). Thus, until the parties here actually submit the matter to arbitration and the arbitrator determines the arbitration procedures, a trial court *cannot* know all "the particulars" of the specific arbitration process now at issue (maj. opn., *ante*, at p. 34) and, therefore, cannot consider those features in determining unconscionability.

Equally, if not more, problematic is the majority's view that, in determining unconscionability, a trial court may consider "the value of" the benefits under the Berman procedure that Moreno has surrendered. (Maj. opn., *ante*, at p. 38.) To

---

[2] The majority's view that it is enough to determine "what an employee can afford when a wage dispute arises" (maj. opn., *ante*, at p. 59), "is contrary to statute." (*Parada*, *supra*, 176 Cal.App.4th at p. 1583.)

11

begin with, as the majority's introductory discussion explains, an employee has no *entitlement* to a Berman hearing; upon receiving a wage claim, the Labor Commissioner has discretion to provide for a hearing, but may also choose to " 'take no further action on the complaint.' " (Maj. opn., *ante*, at p. 7; see § 98, subd. (a).) Thus, it was at the time the agreement was signed, and remains today, entirely speculative whether the Berman procedure is of any value to Moreno.

Also speculative is the majority's assertion that the Berman procedure is speedy, informal, and affordable. Regarding speed, we have previously observed that, because of "the time consumed by the various procedural steps" in Berman proceedings, there is "typically" a four- to six-month "delay" between the filing date and the Berman hearing. (*Cuadra v. Milan* (1998) 17 Cal.4th 855, 860.) In this case, Sonic has documented cases in which commencement of a Berman hearing took a year or more.[3] (*Sonic I*, *supra*, 51 Cal.4th at p. 681, fn. 5.) After concluding the hearing, the Labor Commissioner has 15 days to file a decision, and that decision, assuming there is no appeal, does not become final for another 10 days. (§§ 98.1, subd. (a), 98.2, subds. (a), (d).) *Either* side may appeal from the Labor Commissioner's decision and obtain a trial de novo *in court*. (§ 98.2, subd. (a)). Finally, the Labor Commissioner has discretion to "stay execution of any [final] judgment" for "good cause" and to "impose the terms and conditions of the stay of execution." (§ 98.2, subd. (g).) Notably, the majority concedes that it is "unclear" — i.e., it is speculative — how the Labor Commissioner's statutory discretion to stay execution of a final judgment impacts the Labor Commissioner's

---

[3] Under the Berman statutes, the Labor Commissioner has at least 90 days after deciding to proceed with a hearing actually to hold it, and may "postpone or grant additional time before setting a hearing [upon] find[ing] that it would lead to an equitable and just resolution of the dispute." (§ 98, subd. (a).) The Labor Commissioner's "understanding" of this provision is that a simple request by one of the parties constitutes an appropriate ground for delay. (*Cuadra v. Milan*, *supra*, 17 Cal.4th at p. 860.)

12

duty to make efforts to ensure that judgments are satisfied. (Maj. opn., *ante*, at p. 55.) More broadly, despite its claims about the Berman process's " 'greater efficiency and speed' " (maj. opn., *ante*, at p. 37), the majority also concedes that there is "no evidence" a wage claim will be resolved faster through the Berman process than through Sonic's arbitration procedure. (Maj. opn., *ante*, at p. 54.) This is not surprising; it is self-evident that the dual fora procedure under the Berman statutes — involving an administrative hearing *potentially followed by* a formal trial de novo in superior court — is not speedier or more streamlined than arbitration.

Regarding formality, a Berman hearing is not nearly as informal as the majority suggests. In 2002, when Moreno signed the arbitration agreement, the Labor Commissioner's published policies and procedures stressed (and still stress today) that Berman hearings "are formal procedures" at which each party has the right to be represented by counsel, to present evidence, to testify under oath and have other witnesses testify under oath, to cross-examine the opposing party and witnesses, and to subpoena witnesses, documents and records. (Dept. of Industrial Relations, Div. of Labor Stds. Enforcement (DLSE), Policies and Procedures for Wage Claim Processing (2001 rev.) pp. 2-4; see also DLSE, Policies and Procedures for Wage Claim Processing (2012 rev.) pp. 2-4.) Of course, the trial de novo in superior court to which either side is entitled after a Berman hearing would involve all the formalities of any litigation. It would also greatly increase the cost of the Berman procedure; as this court has observed, because a losing employer has a right to a trial de novo in superior court, "Berman hearings may result in no cost savings to the employee." (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 464 (*Gentry*).)[4] Thus, whether a Berman procedure is speedy,

---

[4]      *Gentry* was not, as the majority states, discussing whether "thousands of individual Berman hearings would . . . result in cost savings as compared to a

informal, and low cost, either in the abstract or in comparison to Sonic's arbitration procedure — which does not provide for a formal trial de novo in court — is entirely speculative.

Other asserted benefits of the Berman procedure are likewise speculative. The majority notes that, before the holding of a Berman hearing, the Labor Commissioner's staff "*may* attempt to settle claims either informally or through a conference between the parties." (Maj. opn., *ante*, at p. 7, italics added.) However, these efforts are entirely discretionary; in any given case, the Labor Commissioner may choose not to make any informal settlement attempts. The majority also emphasizes the requirement that an employer wishing to file an appeal must post an undertaking with the court in the amount of the award. (Maj. opn., *ante*, at p. 8.) However, an employee who has agreed to arbitrate a controversy may obtain provisional remedies — such as an attachment or a preliminary injunction requiring payment of wages during the arbitration — in connection with the controversy.[5] (Code Civ. Proc., § 1281.8.) The majority next emphasizes the Berman procedure's fee-shifting provision, which specifies that only unsuccessful appellants are liable for attorney fees. (Maj. opn., *ante*, at p. 9.) As the majority notes, this provision *may* discourage an employer who is unsuccessful in the administrative proceeding from filing an appeal. (Maj. opn., *ante*, at p. 10.) But it likewise may discourage *an employee* who is unsuccessful in

___

single class proceeding." (Maj. opn., ante, at p. 54.) It was explaining that a losing employer's right to a trial de novo under the Berman procedure can negate any cost savings of the procedure "to *the employee*," i.e., to an individual employee. (*Gentry*, *supra*, 42 Cal.4th at p. 464, italics added.)

[5] If, as the majority asserts, the purpose of the Berman undertaking requirement is to counteract an employer's efforts "to avoid enforcement of the judgment" (maj. opn., *ante*, at p. 8), then it is unclear why the majority finds it significant that obtaining provisional relief requires a showing that " 'the award to which the applicant may be entitled may be rendered ineffectual without provisional relief.' " (Maj. opn., *ante*, at p. 55.)

14

the administrative proceeding — because he or she recovered either nothing at all or less than was sought — from filing an appeal. Of course, we have no *evidence* regarding the provision's actual effect on either employers or employees, and any attempt to quantify that effect would be pure speculation. Moreover, although, as the majority notes, the current version of section 98.2, subdivision (c) provides that "[a]n employee is successful [on appeal] if the court awards an amount greater than zero" (§ 98.2, subd. (c); see maj. opn., *ante*, at pp. 8-9), this provision did not exist until the year *after* Moreno signed the arbitration agreement, so it is irrelevant to determining whether the arbitration agreement in this case was "unconscionable at the time it was made."[6] (Civ. Code, § 1670.5, subd. (a).) The majority also emphasizes the Labor Commissioner's statutory authority to represent claimants in de novo proceedings. (Maj. opn., *ante*, at p. 9.) But that authority applies *only* to "a claimant financially unable to afford counsel" and, even as to such a claimant, is *discretionary* unless the claimant "is attempting to uphold the amount awarded by the Labor Commissioner and is not objecting to any part of the Labor Commissioner's final order." (§ 98.4.) Given all of these uncertainties, the trial court on remand can only speculate on what, if any, "value" the possibility of a Berman hearing had to Moreno at the time he signed the arbitration agreement.

---

[6]   In July 2002, when Moreno signed the agreement, the law was unclear as to whether an appealing employee was successful if the award on appeal was not greater than the administrative award, and we had granted review to resolve a split of published authority on the issue. (*Smith v. Rae-Venter Law Group*, rev. granted Aug. 29, 2001, S098760.) In December 2002, we held that an appealing employee is "unsuccessful" within the meaning of the fee statute if he or she does not obtain a "more favorable" judgment on appeal. (*Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 351, 370.) The next year, the Legislature added the sentence the majority quotes. (Stats. 2003, ch. 93, § 2, p. 790.)

15

My conclusion that, at the petition to compel stage, the value of the Berman procedure to a particular employee in a given case is speculative does not, as the majority asserts, "disparage[]" that procedure. (Maj. opn., *ante*, at p. 55.) It is, after all, the majority that is requiring the trial court to determine the potential "value" of the Berman procedure to Moreno. (Maj. opn., *ante*, at p. 38.) Insofar as the majority presumes that the Berman procedure would be beneficial to Moreno and superior to Sonic's arbitration procedure, and the majority places the burden on Sonic to introduce evidence showing otherwise (see maj. opn., *ante*, at p. 34), the majority reverses our established approach to unconscionability. As earlier noted, Moreno, as the party asserting the defense, has the burden to prove unconscionability. (*Pinnacle*, *supra*, 55 Cal.4th at p. 236.) Thus, he should have the burden of proving the value of the Berman procedure in this case and the features, costs, and risks of Sonic's arbitration procedure. (See *Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 415 ["the party resisting arbitration" must show "that the rules under which arbitration is to proceed will deprive it of a fair procedure"].)

Indeed, my conclusion regarding the speculative benefit of a Berman proceeding, and my consequent rejection of the majority's case-by-case approach, are fully consistent with our existing precedent, including the *Sonic I* majority's opinion in this very case. In *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 111, the court observed that "[t]urning a motion to compel arbitration into a mini-trial on the comparative costs and benefits of arbitration and litigation for a particular employee would not only be burdensome on the trial court and the parties, but would likely yield speculative answers." In this case, the *Sonic I* majority *extended* this analysis to the comparative costs and benefits of arbitration and Berman procedures; in adopting a categorical prohibition against all Berman waivers as a matter of public policy, it

16

expressly rejected the very case-by-case approach the majority now proposes *precisely because* a trial court, at the petition-to-compel "stage," "is in no position to determine" "whether and to what extent a particular wage claimant will benefit from the Berman hearing process." (*Sonic I*, *supra*, 51 Cal.4th at p. 683.) The majority fails to explain why, in the context of determining unconscionability — rather than public policy — during a petition to compel, a trial court is in any better position to determine "whether and to what extent a particular wage claimant will benefit from the Berman hearing process." (*Sonic I*, *supra*, 51 Cal.4th at p. 683.) The majority's superficial and unpersuasive attempt to distance itself from *Sonic I*'s unqualified statement (maj. opn., *ante*, at pp. 59-60), and its embrace of the case-by-case approach it previously rejected in this very case, suggest that the majority, having been rebuffed by the high court in its first attack on this predispute arbitration agreement, is now simply searching for a new plan of attack.

For all of the preceding reasons, the approach to unconscionability the majority's dicta outlines is hopelessly vague and unworkable, and is inconsistent with existing California law.

## VI. The Majority's Approach Is Inconsistent with, and Preempted by, the FAA.

In *Sonic I*, it was clear to me that the FAA, as authoritatively construed by the United States Supreme Court, preempts the *Sonic I* majority's public policy rule. (*Sonic I*, *supra*, 51 Cal.4th at pp. 706-712 (dis. opn. of Chin, J.).) It is equally, if not more, clear that, under the high court's decisions, the FAA preempts the unconscionability analysis the majority's dicta now describes.

Not surprisingly, this conclusion most clearly appears from *Concepcion*, the very decision the high court directed us to consider when it vacated the judgment in *Sonic I* and remanded the case to us. There, as noted above, the high

17

court held that the FAA preempts "the *Discover Bank* rule," which "classifie[s] most collective-arbitration waivers in consumer contracts as unconscionable." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1746].)  In adopting this rule, this court found that such waivers are "exculpatory" because damages in consumer cases are "often [too] small" to warrant individual action.  (*Discover Bank*, *supra*, 36 Cal.4th at p. 161.)  Thus, the court reasoned, class arbitrations often are "inextricably linked to the vindication of substantive rights" and provide " 'the only effective way to halt and redress . . . exploitation' " of consumers. (*Ibid.*)  In *Concepcion*, the high court rejected that analysis, holding that the FAA precludes a state court from finding an arbitration provision unconscionable based on the need to protect "small-dollar claims that might otherwise slip through the legal system." (*Concepcion*, *supra*, at p. __ [131 S.Ct. at p. 1753].)  "States," the court declared, "cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons."  (*Ibid.*)

More recently, in *American Express Co. v. Italian Colors Restaurant* (2013) __ U.S. __, __ [133 S.Ct. 2304, 2310] (*Italian Colors*), the high court further explored the "effective vindication" approach that underlies the majority's unconscionability discussion.  (See maj. opn., *ante*, at p. 29 [*Sonic I* "did not address whether any barrier to vindicating such rights would make the arbitration agreement unconscionable"].)  There, in resisting a motion to compel arbitration, plaintiffs argued that a class action waiver in the relevant arbitration provision prevented them from effectively vindicating their rights under the federal antitrust laws "because they [had] no economic incentive to pursue their antitrust claims individually in arbitration." (*Italian Colors*, *supra*, at p. __ [133 S.Ct. at p. 2310].)  In support, they submitted a declaration showing that their maximum individual recovery would be approximately $38,000, and the cost of the expert analysis necessary to prove their claims would be at least several hundred thousand dollars

and could exceed $1 million.  (*Id.* at p. __ [133 S.Ct. at p. 2308].)  The high court rejected the argument, explaining:  The effective vindication "exception" to the FAA's requirement that arbitration agreements be enforced according to their terms "finds its origin in the desire to prevent 'prospective waiver of a party's *right to pursue* statutory remedies,' [citation].  That would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights.  And it would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable.  [Citation.]  But the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy.  [Citation.]" (*Id.*, at pp. __ [133 S.Ct. at pp. 2310–2311].)  As *Concepcion* "established," "the FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims." (*Italian Colors*, *supra*, at p. __, fn. 5 [133 S.Ct. at p. 2312, fn. 5].)  Because its " ' "principal purpose" ' " is the enforcement of arbitration agreements according to their terms," the FAA "favor[s] the absence of litigation when that is the consequence of a class-action waiver." (*Ibid.*)

Under these binding precedents, the FAA preempts the approach to unconscionability the majority describes.  To the extent an arbitration agreement "forbid[s] the assertion of certain statutory rights," and "perhaps" to the extent it imposes "filing and administrative fees . . . that are so high as to make access to the forum impracticable," the FAA may not require enforcement of the agreement according to its term. (*Italian Colors*, *supra*, __ U.S. at p. __ [133 S.Ct. at p. 2310-2311].)  Short of that, under the FAA, an arbitration provision may not be invalidated as unconscionable because of a court's subjective determination that a given arbitration procedure is not "affordable and accessible" (maj. opn., *ante*, at pp. 34, 36, 39), or that its costs and risks " 'effectively' " render a wage claim not

19

worth pursuing (maj. opn., *ante*, at p. 36) and thus erect a "barrier to vindicating [wage] rights" (maj. opn., *ante*, at p. 29). The FAA, as the high court has construed it, precludes state courts from finding an arbitration provision unconscionable based on the need to protect "small-dollar claims that might otherwise slip through the legal system," even though that goal may be "desirable." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1753].) It "trumps *any* interest in ensuring the prosecution of low-value claims" and "favor[s] the absence of litigation when that is the consequence of" following its "command" to enforce arbitration agreements "according to their terms." (*Italian Colors*, *supra*, at p. __, fn. 5 [133 S.Ct. at p. 2312, fn. 5], italics added.) The majority's approach, which appears to go far beyond what the high court has declared the FAA permits, is therefore preempted.

The majority's attempts to reconcile its dicta with these binding precedents are unpersuasive. The majority first asserts that, "because the Berman statutes 'promote the very objectives of 'informality,' 'lower costs,' 'greater efficiency and speed,' and use of 'expert adjudicators,' '" its approach "does not pose an obstacle to the achievement of the FAA's objectives as construed in *Concepcion*." (Maj. opn., *ante*, at p. 38.) However, it is obvious that using the unconscionability doctrine to invalidate arbitration agreements and mandate either Berman procedures or Berman-like procedures frustrates what *Concepcion*, like many high court decisions before it, identified as "[t]he 'principal purpose' of the FAA": "to 'ensur[e] that private arbitration agreements are enforced according to their terms.' [Citations.]" (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1748]; see also *Stolt-Nielsen v. Animalfeeds International Corp.* (2010) 559 U.S. 662, 682 ["we have said on numerous occasions that the central or 'primary' purpose of the FAA is to ensure that 'private agreements to arbitrate are enforced according to their terms' "].) *Concepcion* and other high court decisions unequivocally

20

establish that this "preeminent" principle (*Dean Witter Reynolds, Inc.* v. *Byrd* (1985) 470 U.S. 213, 221) applies even to adhesive contracts, even when the state seeks to vest initial jurisdiction of the dispute in another forum, and even if arbitration is not the most streamlined means of resolving a dispute. (*Concepcion*, *supra*, at pp. ___ [131 S.Ct. at p. 1748-1749]; *Preston v. Ferrer* (2008) 552 U.S. 346, 349-350; *Dean Witter Reynolds, Inc.* v. *Byrd*, *supra*, at pp. 217-221.)

But here, because arbitration *is* more streamlined than the Berman process, the majority's approach also frustrates other FAA objectives the high court emphasized in *Concepcion*. (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1749].) As explained above (*ante*, pp. 10-11), because the procedural steps of the Berman process cause appreciable delay before an administrative hearing is even held and because any party to that process is entitled to a *formal* trial de novo in superior court *after* a Berman hearing, the majority's approach is likely to produce procedures that are *less* efficient, *more* costly, *more* formal, and *more* time consuming than arbitration. In asserting otherwise, the majority never factors in the trial de novo option under the Berman statutes; it makes no attempt to explain how a procedure involving an administrative hearing *followed by* a full, formal trial de novo in superior court does not interfere with the attributes of arbitration it identifies: lower costs, greater efficiency and speed, and informality. (Maj. opn., *ante*, at pp. 28-29.) Moreover, *Concepcion* does not, as the majority suggests, identify the "use of 'expert adjudicators' " as a benefit of arbitration (maj. opn., *ante*, at p. 38); it identifies " '*the ability to choose* expert adjudicators' " (*Concepcion*, *supra*, at p. ___ [131 S.Ct. at p. 1751], italics added). The Berman process eliminates this choice and, contrary to the parties' agreement, *imposes* a particular adjudicator. Thus, contrary to the majority's assertion (maj. opn., *ante*, at p. 38), the majority's approach *does* contravene *Concepcion*'s preemption principles by " 'stand[ing] as an obstacle to the accomplishment and

21

execution of *the full purposes and objectives* of Congress' " in passing the FAA. (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1753], italics added).

Moreover, *Italian Colors* establishes that the very *process* the majority prescribes for determining the accessibility and affordability of the arbitration procedure in a given case poses such an obstacle. There, the high court rejected an approach that would " 'require courts to proceed case by case to tally the costs and burdens to particular plaintiffs in light of their means' " and " 'the size of their claims . . . .' " (*Italian Colors*, *supra*, __ U.S. at pp. __ [133 S.Ct. at pp. 2311-2312].) "Such a preliminary litigating hurdle," the court explained, "would undoubtedly destroy the prospect of speedy resolution that arbitration in general and bilateral arbitration in particular was meant to secure. The FAA does not sanction such a judicially created superstructure." (*Id.* at p. __ [133 S.Ct. at p. 2312].) The majority's case-by-case inquiry is the very type of "superstructure" the FAA prohibits. (*Ibid*.)

Nothing supports the majority's unsupported speculation that its case-by-case inquiry will be different, i.e., that a mini-trial on the comparative costs and benefits of arbitration and the Berman procedure for a particular employee will not impose a preliminary litigating hurdle. (Maj. opn., *ante*, at pp. 50-51.) Under the majority's approach, the parties will be submitting evidence on any number of issues, including the following: what arbitration procedure the employee can currently afford and whether that "materially differ[s]" from what he or should could have afforded when the parties signed the arbitration agreement (maj. opn., *ante*, at p. 59); what were (and perhaps are) the rules that govern the arbitration; what will the unspecified arbitration procedures be; are Berman procedures "in practice, rarely used and generally unavailable to the employee" (maj. opn., *ante*, at p. 53); how long will it take to resolve the employee's wage claim through the Berman procedure, including a possible trial de novo in superior court, and how

22

long will it take to resolve the wage claim through the arbitration procedure (maj. opn., *ante*, at p. 54); how much will it cost to resolve the employee's wage claim through the Berman procedure, including a possible trial de novo, and how much will it cost to resolve the wage claim through the arbitration procedure (maj. opn., *ante*, at p. 54); how often do parties request a trial de novo ((Maj. opn., ante, at p. opn., *ante*, at p. 63)?  Given the parties' need to litigate all of these matters in the trial court, and the availability of appellate review of the trial court's decision (Code Civ. Proc., § 1294, subd. (a); *Parada*, *supra*, 176 Cal.App.4th at p. 1560), the majority's "anticipat[ion]" that its approach will not create the kind of preliminary, arbitration-delaying litigating hurdle *Italian Colors* discussed (maj. opn., *ante*, at p. 48) is just wishful thinking.  This conclusion reflects a "lack of confidence" only in the majority's unwarranted optimism, not, as the majority asserts, "in the ability of our trial courts."  (Maj. opn., *ante*, at p. 63.)

In any event, I disagree with the majority that, so long as states and their courts do not interfere with fundamental attributes of arbitration, *Concepcion* allows them to invalidate arbitration agreements as unconscionable based on a policy judgment that the arbitration procedure is not adequately affordable and accessible.  (Maj. opn., *ante*, at pp. 30-51.)  Under the majority's narrow reading of *Concepcion*, the FAA's savings clause permits states, for policy reasons, to impose all sorts of arbitration procedures that are not within the terms of the parties' arbitration agreement, so long as those procedures do not interfere with fundamental attributes of arbitration.  This view is contrary to the high court's statement in *Concepcion* that the FAA embodies a " 'liberal federal policy favoring arbitration agreements, *notwithstanding any state substantive or procedural policies to the contrary*,' [citations]."  (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1749], italics added.)  It is also inconsistent with *Concepcion*'s statement that, although a state's unconscionability rules may

23

"address[] the concerns that attend contracts of adhesion," they may not "conflict with the FAA or *frustrate its purpose to ensure that private arbitration agreements are enforced according to their terms*." (*Id.* at p. __, fn. 6 [131 S.Ct. at p. 1750, fn. 6], italics added.) Thus, under the FAA, a state court may not, based on principles of unconscionability, refuse to enforce an arbitration agreement according to its terms simply because the arbitration procedure lacks features the Legislature, as a matter of policy, established for "a particular class" — employees — to "mitigate the risks and costs of pursuing" wage claims (maj. opn., *ante*, at p. 44) or to make recovery of wages owed more "accessible, informal, and affordable" (maj. opn., *ante*, at p. 48). In enacting the FAA, Congress "intended to foreclose [such] legislative attempts to undercut the enforceability of arbitration agreements." (*Southland Corp. v. Keating* (1984) 465 U.S. 1, 16 (*Southland*).)

Indeed, the majority's assertion that its weighing approach to unconscionability applies, not generally, but *only* where "a particular class has been legislatively afforded specific protections in order to mitigate the risks and costs of pursuing certain types of claims" (maj. opn., *ante*, at p. 42) further demonstrates that the majority's approach is inconsistent with, and therefore preempted by, the FAA. The majority premises its approach on the FAA's savings clause, which provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2; see maj. opn., *ante*, at p. 29.) In *Southland*, Justice Stevens invoked this clause to justify the prohibition against arbitration we had read into California's Franchise Investment Law (Corp. Code § 31000 et seq.). (*Southland*, *supra*, 465 U.S. at pp. 18-22 (conc. & dis. opn. of Stevens, J.).) He reasoned that, because a contract void as contrary to public policy is revocable at law or in equity, the FAA does not preempt a state law that

24

"provid[es] special protection" to franchisees by declaring agreements to arbitrate claims under the Franchise Investment Law void as a matter of public policy. (*Id.* at pp. 21-22 (conc. & dis. opn. of Stevens, J.).) The majority in *Southland* rejected this view, finding that the "defense to arbitration" we had read into the Franchise Investment Law was "not a ground that exists at law or in equity 'for the revocation of *any* contract' but merely a ground that exists for the revocation of arbitration provisions in contracts subject to the California Franchise Investment Law." (*Id.* at p. 16, fn. 11.) It also rejected the view that " 'a state policy of providing special protection for franchisees . . . can be recognized without impairing the basic purposes of the [FAA],' [citation]." (*Ibid.*) "If we accepted this analysis," the court explained, "states could wholly eviscerate congressional intent to place arbitration agreements 'upon the same footing as other contracts,' [citation] simply by passing statutes such as the Franchise Investment Law. We . . . reject[] this analysis because it is in conflict with the [FAA] and would permit states to override the declared policy requiring enforcement of arbitration agreements." (*Ibid.*)

The majority's approach is inconsistent with *Southland*. Like the defense to arbitration we read into the Franchise Investment Law, the defense to arbitration the majority now reads into the Berman statutes is not a ground that exists at law or in equity for the revocation of *any* contract, but is, according to the majority's own assertion, merely a ground that exists for the revocation of arbitration provisions in contracts subject to the Berman statutes or to other statutes that "legislatively" afford to "a particular class . . . specific protections in order to mitigate the risks and costs of pursuing certain types of claims." (Maj. opn., ante, at p. 44.) Moreover, it "conflict[s] with" the FAA by enabling our Legislature, "simply by passing statutes such as" the Berman statutes, "to override the declared [federal] policy requiring enforcement of arbitration agreements" and to "wholly

25

eviscerate congressional intent to place arbitration agreements 'upon the same footing as other contracts.' " (*Southland*, *supra*, 465 U.S. at pp. 16-17, fn. 11.) Under *Southland*, it is, therefore, preempted.

Given this analysis, I disagree with the majority's broad assertion that the FAA does not preempt unconscionability rules that apply "uniquely in the context of arbitration." (Maj. opn., *ante*, at p. 30.) As the high court has held, in cases where the FAA applies, a state court may not, "in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law." (*Perry v. Thomas* (1987) 482 U.S. 483, 492, fn. 9.) In other words, as *Concepcion* explains, "a [state] court may not 'rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable.' " (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1747].) The majority's approach violates this principle insofar as it departs from our existing law of unconscionability and crafts different unconscionability rules for arbitration agreements.[7] Under the high court's decisions, the majority cannot invent a unique rule for implementing a legislative policy decision to confer "specific protections" on "a particular class" (maj. opn., *ante*, at p. 42) and avoid preemption simply by calling that rule a rule of unconscionability.

Finally, for two reasons, I also disagree with the majority's view that the high court's FAA decisions allow us to "consider the value of benefits provided by the Berman statutes" in determining unconscionability. (Maj. opn., *ante*, at p. 38.) First, insofar as this approach will require a complex and speculative inquiry into the purported value of the Berman statutes to a particular employee at the time the

---

[7] Whether, under current high court precedent, the FAA preempts any of the other unique unconscionability rules the majority's dicta discusses (maj. opn., *ante*, at pp. 29-31) is not before us in this case.

contract was signed, it is, as earlier explained, inconsistent with *Italian Colors*, *supra*, __ U.S. at pages __ [133 S.Ct. at pp. 2311-2312]. Second, even were it possible for a trial court to assign any meaningful value to these speculative benefits, considering that value would be fundamentally inconsistent with *Concepcion* and *Italian Colors*. In the former, the high court held that state courts may not base a finding of unconscionability on the value of class arbitration to litigants with "small-dollar claims." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1740].) In the latter, the court, expressly applying *Concepcion*, held that an arbitration agreement may not be invalidated based on individualized proof that what the plaintiffs have waived — the right to class arbitration — is so valuable that, without it, the costs of pursuing their claims are prohibitive. (*Italian Colors*, *supra*, __ U.S. at pp. __ [133 S.Ct. at pp. 2311-2312].) These binding interpretations of the FAA preclude us from invalidating an arbitration provision as unconscionable based on the supposed value to a particular employee of the Berman procedure. As *Concepcion* "established," "the FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims." (*Italian Colors*, *supra*, at p. __, fn. 5 [133 S.Ct. at p. 2321, fn. 5].) Thus, it is the high court, not I, that has construed the FAA to require adherence to its primary purpose — enforcing arbitration agreements according to their terms — " 'at the expense of harming other values that the legislature deems important.' " (Maj. opn., *ante*, at p. 63.) The court could hardly have been clearer in *Italian Colors*: the FAA "favor[s] the absence of litigation when that is the consequence of" following its "command" to enforce arbitration agreements "according to their terms." (*Italian Colors*, *supra*, at p. __, fn. 5 [133 S.Ct. at p. 2312, fn. 5].)

For all of the above reasons, the majority's approach is inconsistent with the FAA. Although the majority purports to be faithfully applying "the FAA's

27

savings clause" (maj. opn., *ante*, at p. 29), which permits arbitration agreements "to be invalidated by 'generally applicable contract defenses, such as . . . unconscionability' " (*Concepcion, supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1746]; see 9 U.S.C. § 2), it is, in reality and contrary to *Concepcion*, applying the unconscionability defense "in a fashion that disfavors arbitration" (*Concepcion,* at p. __ [131 S.Ct. at p. 1747]) and that "derive[s] [its] meaning from the fact that an agreement to arbitrate is at issue" (*id.* at p. __ [131 S.Ct. at p. 1746]). Therefore, the majority's unconscionability approach is preempted by the FAA.

## VII. Conclusion.

In *Concepcion*, the high court, in invalidating another of this court's unconscionability rules for refusing to enforce arbitration provisions, first noted that "judicial hostility" towards arbitration has "manifested itself in 'a great variety' of 'devices and formulas.' " (*Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1747].) Then, in the very next sentence, it commented: "And although these statistics are not definitive, it is worth noting that California's courts have been more likely to hold contracts to arbitrate unconscionable than other contracts. [Citations.]" (*Ibid.*) Ignoring the high court's clear message and undeterred by another reversal, today, the majority " 'formula[tes]' " yet another " 'device' " (*ibid.*) for invalidating arbitration agreements: a case-by-case, hopelessly vague, subjective, and indeterminable assessment of (1) the value of the benefits of the Berman procedure to a particular employee, and (2) the accessibility and affordability to that employee of the specific arbitration procedure to which he or

she has agreed.  The majority's approach is inconsistent with California law and is preempted by the FAA.  I therefore dissent from that part of the majority's opinion and from the judgment.

CHIN, J.

I CONCUR:

BAXTER, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Sonic-Calabasas A, Inc. v. Moreno

_____

**Unpublished Opinion** XXX NP opn. filed 7/12/11 2d Dist., Div. 4
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S174475
**Date Filed:** October 17, 2013

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Aurelio Munoz

_____

**Counsel:**

Fine, Boggs & Perkins, John P. Boggs and David J. Reese for Plaintiff and Appellant.

Mayer Brown, Evan M. Tager, Archis A. Parasharami, Brian J. Wong, Donald M. Falk; National Chamber Litigation Center, Inc., and Robin S. Conrad for the Chamber of Commerce of the United States as Amicus Curiae on behalf of Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons, Karin Dougan Vogel and Matthew M. Sonne for Employers Group as Amicus Curiae on behalf of Plaintiff and Appellant.

Horvitz & Levy, Lisa Perrochet, Felix Shafir and James A. Sonne for California New Car Dealers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Locker Folberg, Miles E. Locker and Rachel Folberg for Defendant and Respondent.

Hina B. Shah; Cynthia Rice; Jose Tello; Miye Goishi; Silas Shawver; Fernando Flores and Charlotte Noss for Asian Law Caucus, Asian Pacific American Legal Center, Bet Tzedek Legal Services, California Rural Legal Assistance, Inc., Centro Legal de La Raza , Garment Worker Center, Hastings Civil Justice Clinic, Katharine and George Alexander Community Law Center, La Raza Centro Legal, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Legal Aid Foundation of Los Angeles, Legal Aid Society-Employment Law Center, Maintenance Cooperation Trust Fund, National Employment Law Project, National Lawyers Guild Labor and Employment Committee, Neighborhood Legal Services of Los Angeles County, Wage Justice Center, Women's Employment Rights Clinic of Golden Gate University School of Law and Worksafe Law Center as Amici Curiae on behalf of Defendant and Respondent.

McGuinn, Hillsman & Palefsky, Cliff Palefsky, Keith Ehrman; Smith & McGinty and Valerie T. McGinty for California Employment Lawyers Association and Consumers Attorneys of California as Amici Curiae on behalf of Defendant and Respondent.

William A. Reich and Anne Hipshman for California Labor Commissioner Julie A. Su as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John P. Boggs
Fine, Boggs & Perkins
80 Stone Pine Road, Suite 210
Half Moon Bay, CA  94019
(650) 712-8908

Felix Shafir
Horvitz & Levy
15760 Ventura Boulevard, 18th Floor
Encino, CA  91436-3000
(818) 995-0800

Miles E. Locker
Locker Folberg
71 Stevenson Street, Suite 422
San Francisco, CA  94105
(415) 962-1626

Cliff Palefsky
McGuinn, Hillsman & Palefsky
535 Pacific Avenue
San Francisco, CA  94133
(415) 421-9292